United States District Court for the District of Connecticut

FILED

Jury Trial Demanded 2016 AUG 12 PM 4 03

U.S. DISTRICT COURT
NEW HAVEN, CT.

3:16cv1380(AWT)

John Doe,

Plaintiff

v.

Yale University,

Defendant

## COMPLAINT

1.    Plaintiff John Doe, (hereinafter, "John" or "Doe"), files this Complaint and in support thereof alleges as follows:

## NATURE OF THE ACTION

2.    This case arises out of actions taken by Defendant Yale University ("Yale" or "the University") concerning false allegations of sexual misconduct made against John, a male student at Yale with an otherwise unblemished academic and disciplinary record,

made by Jane Roe, ("Jane," "Roe" "Jane Roe #1") a female student at Yale at the time of the allegation.

3.    Upon information and belief, Defendant Yale University is a non-profit corporation organized under the laws of the State of Connecticut operating as a private liberal arts University located in New Haven, Connecticut. John is a resident of New York State. Yale is the beneficiary of federal funds within the meaning of 20 U.S.C. $1681 e/ seq. ("Title IX").

## Jurisdiction and Venue

4.    This Court has diversity, federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because: (i) John Doe and Defendant Yale are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; (ii) the claims herein arise under federal law; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

5.    This Court has personal jurisdiction over Defendant Yale on the grounds that Defendant Yale is conducting business within the State of Connecticut.

6.    Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## BACKGROUND

7.      Contemporary discourse of sex and gender often calls for a reevaluation of society's historic attitudes towards issues of gender that many consider to have oppressed one gender in favor of the other. Ingrained notions of gender, often subconscious or un-self conscious, it is often contended, have contributed to sexist norms and policies. One of the goals of this legal filing is to further question ingrained notions of sexism in the service of institutional power, and its use in gender based oppression.

8.      According to Christina Hoff Sommers, a scholar at the AEI, contemporary feminism in academia, often called "third wave feminism" sets the advancement of women backwards in that it often reduces women to fragile flowers or "special snowflakes" without agency or ability to cope. Sommers calls this "fainting couch feminism," in a throwback reference to Victorian era couches for women who, fragile and unable to cope with stress, collapsed on couches in catatonic faints. In this environment, notions of agency and victimhood become gender associated. Men are often considered agentic, actors, and perpetrators; women are considered passive, receptive, and victims.

9.      This lawsuit will explore these notions and how the Yale administration lapses into gender biased prejudices that require women to be protected and men punished, and see women as innocent, men as guilty; women as pure and sympathetic creatures, men as sex starved and demanding; women as passive and men as aggressive.

10.      John Doe entered Yale at a time of great change within the university with respect to Title IX and issues of sexual assault. In March 2011, 16 students and alumni brought a complaint to the Office of Civil Rights of the Federal Department of Education ("OCR") alleging that Yale's failure to respond to a fraternity's crude chants created a

hostile environment for female students on campus. OCR wields the power to penalize

institutions found not to be in compliance with civil rights law with a loss of federal

funding. In 2014-2015, the federal government funded $507.1 million, or 75.3% of Yale's

2015 grant and contract income, in support of Yale's research and training programs[1]. The

loss of these funds would constitute a devastating financial loss to the university. The

complaint claimed the University had not responded "in a prompt and equitable manner"

to a sexually hostile environment on campus. It alleged an "ongoing pattern" of sexual

harassment, and identified the University's grievance processes for handling complaints of

sexual misconduct as inadequate.  In June 2012, after an investigation by OCR, Yale agreed

to a voluntary resolution whereby it would institute steps "to assure that it has an

environment and culture in which all students feel safe and well supported." Such steps

included the creation of the University-Wide Committee on Sexual Misconduct in July 2011,

and the appointment of Deputy Provost Stephanie Spangler in November 2011 as Yale's

Title IX coordinator (YDN[2]).

11.     After the negative publicity the university received from this event, the

university continued to implement steps to ensure that it was in compliance with OCR

demands and to protect its reputation as a school hospitable to female students. Yale was

obligated to report all allegations of sexual misconduct and their resolution in a biannual

report that came to be known as the "Spangler Reports". In these reports, Spangler would

lament the ubiquity of sexual assault on Yale's campus and the need for more students to

---

[1] http://finance.yale.edu/sites/default/files/2014-
2015%20Annual%20Financial%20Report_0.pdf
[2] http://yaledailynews.com/blog/2012/06/15/department-of-education-ends-title-ix-
investigation/

report their assaults to Yale to bring reporting into parity with the supposed regularity of sexual assault on campus.

12.      The University developed a set of policies to regulate sexual misconduct, "Yale Sexual Misconduct Policies."

13.      The University also instituted a University Wide Committee ("UWC") to oversee allegations of Sexual misconduct on campus, and instituted "UWC Procedures" to guide how formal and informal complaints are to be handled by the UWC.

14.      Yale would continue to feel the pressure to come down hard specifically on male students accused of sexual assault and affirmed that it would do so. In one particular high profile incident, that publically portrayed this pressure as well as the university's hostility to men, at an event billed as advancing the global empowerment of women, former President Jimmy Carter publically shamed University President Peter Salovey, in front of thousands of members of the University community in a packed Woolsey Hall, excoriating Yale for not expelling all men found responsible for sexual misconduct--thereby holding Yale accountable as part of the global oppression of women.

15.      "Although Carter drew attention to the oppression of women worldwide — such as female genital mutilation, slavery and honor killings — Carter also focused on the issue of sexual assault on college campuses" according to Yale's daily paper. "In particular, Carter referenced an August 2013 Huffington Post article that noted that six Yale students found guilty of non-consensual sex were not expelled". "You can just warn a boy and chastise him — that doesn't help," Carter said. "One thing to do is not support the boys who are guilty of sexual assaults." "When Carter made note of the six Yale students, a visibly uncomfortable University President Peter Salovey said that Yale's "policies and procedures

5

have changed over the last year or two." "Thank you so much President Carter for that

challenge, a challenge which resonates here at the University," Salovey said during the

talk[3]."

16.     More particularly, Carter framed the reinterpretation of Title IX to prevent

sexual assault as obligating universities to "prevent women from being raped on campus,"

assumed all six respondents who had been found responsible for non-consensual sex were

male, and called for their expulsion. After a standing ovation by the packed crowd, a visibly

contrite Salovey said: "I think our policies and procedures have changed over the last year

or two, we see different outcomes[4]."

17.     By agreeing with Carter's critique, Salovey gave public affirmation that Yale

saw the problem of sexual assault as a male vs. female issue, and thereby implicitly agreed

that Yale's commitment to "eliminating rape, sexual assault and sexual harassment from

our campus" was an effort to come down hard on "the boys" accused of sexual misconduct

as Carter articulated it, to see "different outcomes."

18.     A male student in the room, seeing the entire university present, thousands

of people, including the highest level faculty and administrators, stand on their feet

cheering on Yale's coming down hard on male students accused of sexual misconduct, as

part of advancing women's global empowerment, could easily have perceived a hostile

environment to their maleness, that the mob wanted male blood. Salovey's declining to

correct Carter, or counter the narrative of male on female violence at Yale's campus and the

need to come down hard on the men, contributed to this environment of anti-male hostility.

---

[3] http://yaledailynews.com/blog/2014/12/03/carter-criticizes-universities-response-to-
sexual-assault/
[4] https://www.youtube.com/watch?v=R-kIdCytB1g

## SCHIRMEISTER INCIDENT

19.     John's first encounter with the Title IX apparatus at Yale occurred in late November and early December 2013. On November 25, 2013, John received an email from Title IX Coordinator of Yale College, Associate Dean of the Graduate School, and Associate Dean for Special Projects at Yale College, Pamela Schirmeister, and who, as of summer 2016, according to Yale media, is Associate Dean of the Graduate School, Dean of Special Projects at Yale College and Associate Dean of Yale College.

20.     Schirmeister's email was vague, stating: "I write to you in my capacity as Title IX coordinator for Yale College. I would like to have an informational meeting with you about a report that has come my way."  Away at the time on Thanksgiving break, Doe asked what the report was about. On November 27, Schirmeister responded "I'd like to meet with you about a paper you submitted in a class." Nonplussed what precipitated this request, Doe agreed to meet Schirmeister on December 5, 2013, and requested that he be allowed to be accompanied by a university chaplain.

21.     Doe, along with a university chaplain, met with Schirmeister at her office. Schirmeister informed Doe that he had written a paper in which he talked about rape and that this was of concern to the university. Doe noted that he specifically wrote about rape in his paper as an example of something morally wrong, and asked what the problem was[5]. Schirmeister responded that Doe's choice to talk about rape in his paper made him a person of interest to the university that necessitated intervention to ensure that Doe was

---

[5] All verbal exchanges that were not recorded are recalled herein as John remembers them.

not a perpetrator himself. Doe responded that rape was a necessary example to use in his paper, as it was needed to disprove an argument made by the relevant author. Indeed, the author himself used murder as another example in the same chapter, and rape was the most applicable and salient example to use in this case. Schirmeister responded that she had been teaching English for twenty plus years, and with that experience knows that an example that is unnecessarily provocative serves to distract the reader from the author's argument. Doe was confused why a senior dean at Yale in a position with punitive power would call him in to lecture him about proper writing technique, and responded that he could think of no example more applicable to the specific requirements of the paper than rape, and pointed out that he specifically wrote that rape was wrong. Schirmeister was unswayed.

22.     Schirmeister's inquisition indicates Yale monitors male students who write about rape in their academic assignments as possible rapists. On information and belief, Yale has never censored or monitored a female student who has written about rape. After criticizing another comment of Doe's in regards to another paper he wrote on the same subject, Schirmeister demanded Doe attend "sensitivity training" at the mental health center and instructed him that he was no longer allowed to interact with his assigned Teacher's Assistant, a female, who had been his breakout group instructor, paper reviewer, and grader the whole semester. With less than two weeks left before the end of the term, John was told to bring all his queries to the professor of the class, with whom John had only a superficial relationship with, and, on information and belief, in contravention to University policy at the time that no mandatory restrictions could be placed on a student without the initiation of a formal complaint process. This no contact order was especially

wrongful and deleterious in that it directly impeded Doe's education by protecting an instructor from non-harassing comments of a student made in the pursuit of his education, and banning a student from continuing that relationship in middle of the semester. On information and belief, no female student was ever prohibited from interacting with a teacher for non-harassing comments relevant to their coursework, or for writing about rape in the pursuit of their education. Schirmeister, in her capacity as Title IX Coordinator for Yale College, was an essential and high ranking staff member of the University's Title IX enforcement system, which includes the University Wide Committee on Sexual Misconduct, indicating that prejudice against males permeates Yale's Title IX enforcement system.

23.     Schirmeister would later threaten to revoke Yale funding for Doe's summer plans because Doe and Roe, the latter who had by then graduated, were scheduled to be in the same country, even though they were going to be living in different cities. Schirmeister continued to play a role as an administrator in Doe's UWC proceeding, and displayed continued unusually harsh anti-Doe sentiment, believing that a country was not big enough for two people.

24.     Jane Roe would later reference the incident with Schirmeister in her testimony as a reason why she came forward with her complaint and why Doe needed a more severe punishment, as he was a repeat offender. In this way, then, Yale created it's own self fulfilling prophecy.

25.     Yale is required by OCR to publically disclose all reports of sexual misconduct and Yale's response. When Yale reported this incident, it left out the primary reason Doe was called in, the paper, and omitted that he was instructed not to approach his instructor, in contravention to reporting requirements; on information and belief, because Yale was

aware that such an action went against their policies, and would cast the university in a negative light as hostile to free speech. Yale's covering up their actions in their report is consistent with other instances where Yale omitted from the report actions they took that may reflect negatively on the university.

26.     Schirmeister's actions are especially troubling given Yale's public denial of repression of free speech, and their insistence that academic freedom and freedom of expression are foundational university values. The University's commitment to freedom of expression was cemented in the 1975 Woodward Report, and enshrined in the University's Undergraduate Regulations[6]. It states, in part, that belonging to the University demands

> the right to think the unthinkable, discuss the unmentionable, and challenge the unchallengeable.... Above all, every member of the university has an obligation to permit free expression in the university. No member has a right to prevent such expression. Every official of the university, moreover, has a special obligation to foster free expression and to ensure that it is not obstructed.... we believe that the positive obligation to protect and respect free expression shared by all members of the university should be enforced by appropriate formal sanctions...

27.     This statement was further publically endorsed in November 2015 when Yale University President Peter Salovey and Yale College Dean Jonathan Holloway issued a joint statement stating:

> We also affirm Yale's bedrock principle of the freedom to speak and be heard, without fear of intimidation, threats, or harm, and we renew our commitment to this freedom not as a special exception for unpopular or controversial ideas but for them especially... By preventing anyone from bringing ideas into the light of day, we deny a fundamental freedom -- and rob ourselves of the right to engage with those ideas in a way that gets to the core of Yale's educational mission. We make this expectation as a condition of belonging to or visiting our community[7].

[6] http://yalecollege.yale.edu/sites/default/files/files/URs%202015-2016(1).pdf
[7] http://news.yale.edu/2015/11/10/affirming-our-community-values-message-president-and-yale-college-dean

28.     Yale's President explicitly conditioned belonging to Yale on the individual's affirmation of each community member's right to freedom of expression. The Woodward report specifically calls on Yale officials to ensure this freedom. Schirmeister, an official of high rank at Yale, was neither disciplined nor expelled from the Yale community. She continues to be in a position of high authority at Yale. Yale's ignoring her supression of free expression as a Title IX Coordinator indicates that Yale only pays lip service to this value for publicity purposes, but curates a policy and culture of suppression of free expression behind closed doors through intimidation and repercussions that create a culture of fear and a chilling effect on free expression at the university, in a purge specifically targeting men.

29.     The University's prejudice against men extends beyond their Title IX administration. Yale, which has had equal numbers of men and women since the 90s, has a women's studies program but no men's studies program, and a women's center, but no men's center. The common explanation on campus is that women have been historically oppressed by men and that men continue to control matters of power through a ubiquitous patriarchy, therefore special attention is given to women. This explanation, however, falls short and is susceptible to the apex fallacy. While men may have disproportionately, historically and currently, held positions of power, and historically had better access to education, Yale's obligation under Title IX is to provide equal access to education irrespective of gender. And for the typical Yale student, whether more men have positions of power historically or currently is of little relevance to their access to education in the here and now. No male student at Yale has access to a department set to cater to their

gender identity like women do, and no male has access to a center to discuss, receive

support, and educate themselves about men's issues like women do. Yale perpetuates a

reality on campus that caters to women's needs and education more than it does to men's

needs, and engenders a climate where men's needs are seen as not as important as

women's needs.

30.     Indeed, over the years it has even become politically untenable and seen as

prejudicial to ask for equal rights and provisions for male educational support. Declaring

on campus that one cares about men's issues can lead one to being ridiculed as sexist,

particularly if the men of concern are white. White men are routinely ridiculed in social

media forums at Yale. This has created a hostile environment, particularly for white men, to

talk about their issues or ask for support. Yale is aware of this gender disparity and hostile

environment, and does nothing to correct it.


### JANE ROE'S COMPLAINT


31.     John Doe began a sexual relationship with Jane Roe after talking with her at a

campus dinner in October 2013. After the dinner John said he was going to work at his off

campus apartment, and that Jane was welcome to join him. She did. Later that night they

kissed, and John invited her to stay over. Jane accepted, and, once in bed, asked him for sex.

John had never had sex before due to growing up in a community with tYaional values, but

had been contemplating engaging in sexual activity. When Jane asked for sex, he went with

the moment and acquiesced.

32.     John came from an ethnic minority, low-income family background, and did not have familial or communal support to attend Yale. On information and belief, Jane came from a white, ethnic majority background, from an upper-middle class family, with abundant family support to attend Yale.

33.     John and Jane continued to have sex on the weekends for the remainder of that semester. They did not initially have a discussion about the parameters of the relationship, other than seeing each other on the weekends for sex.

34.     During finals at the end of the semester, Jane told John she needed more sex to deal with her stress, and became increasingly aggressive and demanding on John's time. John told her he couldn't satisfy her demands, and, explained that he didn't have the time during finals period to satisfy her sexual needs or to talk through the relationship. After aggressive texting from Jane, which included Jane emotionally manipulating John by claiming, with increasing intensity, that John's declining to have sex with her made her feel he was ignoring her and wasn't being nice to her, John conceded to meet Jane for a conversation despite his saying that he didn't have time for long discussions. John met Jane twice between finals, and each time the discussion went on for several hours. John tried to keep the conversations short, but Jane refused to let John go, and the conversations would go on for hours, often in circular pathways, which frustrated John due to the pressure of his exams. In both conversations, John repeatedly asked to end the conversation after a while, and Jane refused, going into dramatic hysterics that John was not being nice to her. At the end of the second talk, due to Jane's excessive pressure, emotional manipulation, and hysterics for John to have sex with her, John told Jane their relationship was off. Jane's pressure on John during this time, along with the stress from Schirmeister's concurrent

censorship, played a role in John handing a paper in late. John would receive an F in that

class for late submission, a mark that remained on his transcript for over a year until John

succeeded in having it repealed on appeal.

35.      At the beginning of the Spring semester, in January 2014, John felt bad about

how things ended off with Jane, and now, with more time on his hands and hoping she had

calmed down over break, he reached out to her to ask her if she wanted to talk things

through. Jane consented, and John and Jane met up for a several hour talk during which

John apologized for not being able to give more of his time during the end of last semester.

Jane had other concerns, including that John be "nice to her." Nice, Jane explained, included

John fulfilling all expectations she had of him in their relationship.  John walked Jane back

to her dormitory and Jane invited her in. John accepted the invitation, and inside Jane

insinuated she wanted sex. John said he would have sex again, but he could not live up to

her expectations of what was considered "nice," which encompassed the spectrum of Jane's

relationship expectations, and that if they were going to have sex again, he would be

pleasant to her and they would have sex, and that was it. He could provide no more to the

relationship and she couldn't expect that he would approach her in campus dining halls and

other public areas, among other relationship expectations that Jane included as part of

being "nice," as he wanted to keep their sexual activity private. He would, however, be

"nice" to her in the narrow sense; he would be courteous whenever they were together.

Jane agreed and John and Jane had sex again.

36.      On January 17, John met another woman, Jane Roe #2 ("Roe #2) at a campus

party. They had sex that night. John complained to Roe #2 about the way Roe #1 was

treating him. Roe #2 laughed, and said, "Don't stick your dick in crazy," a term John had

never heard before but seemed sensible. Two days later, Roe #1 sent Doe a series of abusive texts after Doe indicated he did not want to have sex with her that night. The next day Roe called Doe 11 times.  Doe decided to take Roe #2's advice and asked Roe #1 to meet, and asked if they could keep it short. Later that night, on January 22, Doe met Roe #1 in her room, and told her he could no longer have sex with her. Roe #1 was livid. Doe told her he was leaving. Roe angrily, said, "you can't leave me like this." Doe apologized again, and made for the door. The door, however, opened inward, and the wall ran perpendicular to the opening side of the door such that it was impossible to leave without first stepping backwards into the room to allow for the door to open fully. When Doe reached for the door, Roe angrily pulled Doe back into the room. Doe kept on trying to leave, and the more he tried the more angrily and violently Roe would pull him back into the room. Finally, in a fit of anger, Roe pulled John all the way back into the room, twisting him around in the process, and shoving him, pinning him against her bed. "You cannot leave!" she shouted at him, "I'm trying to talk to you!" Doe gave up trying to leave, and spent another hour and change in her room, waiting until Roe would calm down and let him leave.

37.     Doe felt bad afterwards about how this encounter ended, and when he later met Roe around campus, apologized to her again. Roe accepted the apology and asked if they could have sex again. Doe said that would be ok, but he had to be clear: She could not expect anything of him. Her definition of nice included a lot of subjective demands on Doe's attention, time, and behavior, and Doe made clear that she could have no expectations and no demands. If they slept together there would be sex, and that was it. She couldn't expect him to be "nice" to her, however she came to understand the term. Roe agreed, and they started sleeping together again. Doe naively figured that as long as he was pleasant but

made clear boundaries, a sex only relationship could be maintained. At this time, Doe was no longer having sex with Roe #2.

38.     Early in the relationship, Roe told Doe she preferred aggressive sex, and asked Doe to use dirty talk when they had sex together. While Doe was initially uncomfortable with this request, Roe walked him through how to dirty talk to her, and eventually Doe became accustomed to this. From that point on whenever Doe and Roe would have sex, it included dirty talk, as she requested at the outset. However, as the relationship progressed, Roe indicated a desire for other submissive sexual preferences, such as rape fantasy and other practices. Doe was uncomfortable with this, and asked her to write a note to him telling him this was what she wanted. Roe then wrote Doe a note saying: "I the undersigned wish to have erotic sex with John Doe and give him permission to do whatever he wishes with me within the bounds of reason. Jane Roe". Doe later submitted this note to Yale.

39.     As Doe would later show through submitting the entirety of his communication record with Roe #1 to Yale, Roe and Doe had gotten together numerous times for sex, and there was a great imbalance in who was pressuring who for sex. Roe initiated asking to get together for sexual activity 32 times. Doe asked Roe 2 times, plus one other time he asked to get together to communicate a cessation of sexual activity with her. Starting about one month into their relationship, Roe would get upset and easily angered if she felt Doe was ignoring her or putting off her request for sex. In fact, the majority of their textual conversations revolved around this; Roe would ask to come over for sex, Doe would push her off, often saying he didn't have time, Roe would get upset that Doe was ignoring her or not being "nice" to her, and Doe would often cave and find a time to be available for

sex. If Doe wouldn't cave, Roe would persist in sending him texts, often getting angrier and

angrier in tone. Several times, if she felt Doe was ignoring her texts, she would call him

repeatedly and persistently. For example, on the night of December 15-16, during finals

period, she called him five times. On the night of January 19-20 she called him ten times. On

the night of January 20-21, she called him eleven times until he picked up and talked to her

for 25 minutes. On February 9, she called him 8 times within the space of half an hour.

40.     She especially harassed him around exam times when she knew he was

under pressure to complete term assignments. During final exam week of the 2013 fall

semester, she sent him dozens of angry texts whenever he said he was busy studying for

exams. He finally agreed to get together to talk about it if she promised it would be short.

The two conversations he agreed to get together with her for, however, ran on for several

hours, despite Doe's repeated pleadings that they needed to end the conversation so he

could get back to studying.

41.     On March 6, 2014, Doe traveled to NYC for several doctors' appointments. He

got up early in the morning, after less than five hours of sleep, and traveled by public

transport from New Haven to Manhattan and the outlying boroughs of NYC, where he saw

three doctors at three different locations, who presented to Roe a prognosis whereby he

would have to undergo a two year process involving monthly doctor's appointments and

culminating in a major surgery and recovery period among other intrusive and

cumbersome elements, and costing upwards of tens of thousands of dollars out of pocket,

money Doe did not have. Doe was overwhelmed by the prognosis and processing the

decision he had to make. He traveled back to New Haven by train, arriving close to one in

the morning, after more than ten hours that day of public transport including commuter

trains, subways and busses, and another five hours in waiting and examination rooms, for a

fifteen hour long day of travel and doctors appointments. Between his lack of sleep,

extensive travel, and major decisions, Doe was exhausted and overwhelmed. On top of that,

he still had a midterm exam he had to take in the morning, and had not yet studied for it. He

hoped to make use of the early morning hours to cram for this exam.

42.     Jane asked John that evening if she could come over, which was Jane's way of

asking for sex. John explained that he had a full day and had traveled to NYC. At first, John

was reticent to have her over, texting: "I'm back in the Have, but have a midterm tomorrow.

I guess theoretically you can come tonight, but I literally cannot pay any attention to you.

You'd be free to do what you want, though." He made very clear that he had a midterm, that

he had not time for her, and that if she came over she should have an expectation that he

could not pay any attention to her. When she pressed him over whether he really wanted

her to come or not, John replied: "It would be nice for you to come over, but I have to work.

And I mean that. I won't be present. At all." John made absolutely clear that he had to work

and won't be present at all for her. In John and Jane's texting language, this language was

intended and understood as a euphemism for sex: Doe was telling Roe that he did not have

time for sex or conversation; he had to study. Jane chose to come over anyway, later saying

she came over with the intent to have sex. When Jane came over it was already about 1:40

in the morning.

43.     When Jane entered, Doe was sitting on his couch, in the outer room of his

suite, studying. Doe's suite contained an outer room with a couch and a small inner room

with a bed. Jane sat down beside him. After a few minutes, Jane asked him if there was

anything she could do for him, which John and Jane both understood to mean sexually. John

declined. A few minutes later Jane asked again, and Doe told her if she wanted she could give him oral sex, but that he had to continue studying, and apologized that he couldn't pay her any attention. Jane began to give oral sex to John while he studied. After a few minutes, which included occasional small talk, John mentioned to Jane that he had slept earlier in the semester with another woman. John didn't think much of this revelation. He had no obligation to Roe to be exclusive, as they never committed to having exclusive sex, and Doe had later made clear that Roe could not have any expectations from their relationship. Additionally, Doe did not sleep with Roe #2 while Doe and Roe #1 were having sex, as he had called off his relationship with Roe #1 after he and Roe #2 had sex, and only starting sleeping with Roe #1 again after his sexual relationship with Roe #2 ceased.

44.     Roe, however, became livid with Doe. She castigated him for not being monogamous with her, and for putting her in danger of contacting STD's. Doe explained to her that they were never exclusive, and that he only ever had protected sex with Roe #2, and so had no reason to think he was putting Roe #1 in danger. Roe refused to accept these explanations, yelling at him for not being exclusive to her. Doe continued to try to explain to Roe why he thought he did nothing wrong, and apologized to Roe for making her feel this way. Roe refused to accept John's apology, and continued to lambast Doe's faithlessness. Doe had seen this kind of reaction several times from Roe before, during finals the semester before when Roe got angry with him and kept on arguing with Doe despite Doe's pleadings that he had to study for his final exams, and again earlier in the semester when Roe got angry with Doe for saying he wouldn't have sex with her anymore. In those previous instances, Roe would express outrage at Doe, Doe's explanations and pleadings would fall on unreceptive ears, and Doe and Roe would go through hours of circular

arguments despite Doe's pleadings to go to sleep or to study. After first attempting to
assuage Roe, Doe began asking Roe to allow him to study. He explained again and again
how he had an exam he had not yet studied for, how this argument was taking the little
time he had away from studying, and that he was exhausted and needed to study and sleep.
Roe would have none of it and continued her protestations. Doe saw no point in having this
argument at all. He did not ask for it, had nothing to gain from it, and had everything to lose
considering his other needs to sleep and to study. He continued to be patient with Roe, as
he did not want her to be upset or seem uncaring to her. As it got later and after asking her
repeatedly to please let him go to sleep, Doe finally gave up. He had given her a
considerable amount of time, an hour and a half, it was now past 3:30 in the morning, and
Roe was showing no signs of leaving him alone. He had given Roe way more time than he
had. He explained to her that he had no more time, the conversation was going nowhere,
that he had asked many times to end the conversation and for Roe to let him study or go to
sleep. He was exhausted from the day's events, had an exam in the morning, and could no
longer maintain the conversation; he was going to prepare for bed whether or not she let
him. Doe told Roe he would continue the conversation the next day, then brushed his teeth
despite Roe's protestations now that he was ignoring her. Doe wished Roe good night and
entered the inner room in his suite, his bedroom, and climbed into bed.

      45.     Roe followed Doe into his bedroom and complained that Doe could not leave
her like this, that she was upset, and that he was ignoring her. Doe acknowledged that he
could no longer pay her attention, and asked her again to please let him go to sleep. Both
Doe and Roe understood at this point that Doe was asking Roe to leave his apartment so he
could sleep. Roe refused. Doe asked her several more times. Roe continued to refuse,

insisting that Doe could not leave her like this. After several back and forths of this, Doe wished her goodnight again and snuggled up against the far corner of his bed, against the wall, and placed his pillows over his head to try to drown Roe's protestations out. Roe continued insisting, over and over again, that he had to pay her attention and could not leave her like this, asking how he could do this to her. Doe ignored Roe for what was about ten more minutes, but Roe kept nagging him, persisting on keeping him awake even though he had now clearly asked her to leave and to let him go to sleep, and despite Doe's clear and continuous attempt to go to sleep.

46.     Doe did not know what else to do at this point. He had repeatedly asked her to let him go to sleep but she refused. He had given her now about two hours of his time, and his pleas and apologies fell on deaf ears. Like the previous times they had argued when Doe refused Roe sex, this could keep on going on and on. Doe was beyond exhausted. Roe knew this. He was beyond overwhelmed by the day's events, and was under pressure for his exam which was now just a few hours away and which he had barely studied for. He was frustrated and at a loss of how to resolve the situation. He continued to fake sleeping, but this strategy was not working.

47.     Doe was at a loss of what to do. When he had declined to have sex with her on a previous occasion, which sent Roe into fits of fury, Doe had tried leaving and Roe had assaulted him, refusing to let him leave. Doe feared that this time would be no different, and that if he attempted to leave she may attack him again to prevent him from leaving. Even if he succeeded in leaving his apartment, he would be left outside at four in the morning, with nowhere to go, in the cold wintry night.

48.     Finally, after giving up hope to any alternative resolution to the night's events, Doe looked up from under his pillows and asked Roe if they could have sex. Roe was surprised by this request; Doe had been ignoring her with his head under his pillows trying to go to sleep, and she was upset at Doe. She responded: "How can you do this to me?" Doe understood that to mean she was upset Doe wasn't accepting responsibility for his alleged infidelity first. Doe apologized, then asked Roe again to let him go to sleep. Roe refused that too. So Doe asked her again to have sex. Roe asked Doe: How can we have sex if you're not being nice to me? Doe apologized again, and promised that he would be nice to her, that he just wanted to go to sleep.  Roe was somewhat pacified by this. "You're going to be nice to me?" "Yes, I'm going to be nice to you," Doe responded. Roe was still on the fence, so Doe asked Roe again to let him go to sleep. Roe told him he couldn't go to sleep and leave her like this. Doe continued to promise to be nice to Roe, and pleaded with her just to let him go to sleep, and that the next day after his exam they could continue the conversation. Roe continued to refuse to let him go to sleep.

49.     Doe, thoroughly at a loss of what to do, asked Roe again if she would have sex, saying, "Please, I'm going to be nice to you, either let's have sex or let me go to sleep, can we continue the conversation in the morning?" Roe again asked Doe how they could have sex if he wasn't being nice to her. Doe promised again and again that he'd be nice to her. Roe seemed more pacified. "So we'll have sex?" he asked her. "Yes/ okay," she said. In Roe's own testimony, she then entered Doe's bed, got on top of Doe without pants on, and initiated sex. During the next ten to twenty minutes of sexual activity, during which Doe used some of the "dirty talk" that he ordinarily used when they had sex, Roe in no way communicated that she wanted the sex or dirty talk to end. After sex, Doe put his arm over

Roe, "spooning her" and they slept until about 10:30 in the morning when Doe got up to go to his exam. Roe left the apartment as Doe was preparing to leave. As she left, Doe promised to talk to her later in the day to resolve the argument they had the previous night.

50.     When Doe and Roe met next on one of the following nights, Doe explained to Roe that they could no longer sleep together after what she put him through the previous time. Roe accused Doe of raping her and said she only agreed to have sex with Doe because she wanted Doe to be nice to her. Doe was shocked to hear her use that word, but figured arguing with her was futile and instead encouraged her to use less extreme terminology to articulate her feelings. Doe and Roe parted ways. On April 4, Doe sent a text to Roe asking her how she was doing and whether she wanted to talk. Roe responded that she would, but Doe never followed up with her. Later that day, Roe reported that she was raped to university authorities.

51.     On April 14, Roe filed a formal complaint against Doe with the UWC stating that "as the argument escalated, he demanded I have sex with him." I was extremely upset by the argument and told him I did not want to have sex with him. He was verbally abusive and threatening at first, but ended up using physical strength to force me to have sex with him while he insulted me and verbally abused me in other ways. Afterwards, he kept both of his arms around me in an aggressive and forceful way, and I felt too terrified to leave the apartment" Along with the complaint, which Doe received on April 17, Doe received a Notice, explaining that confidentiality precluded Doe from speaking of anything he learned through the UWC with anyone other than his family or University advisor.

52.     Yale's management of Roe's accusations is governed by rules and regulations set forth in Yale's UWC Procedures ("Procedures")[8].

53.     In a meeting several days later with Aley Menon, Secretary of the UWC, Menon instructed Doe about confidentiality restrictions, stating that UWC procedures prohibited Doe from discussing UWC matters with anyone other than his advisor, family, therapist, or chaplain. Doe was shocked that he would not be able to consult a lawyer.

"I'm not able to talk to a lawyer?" he asked incredulous.

"Correct," replied Menon.

"Then how am I supposed to provide a defense for myself?" asked Doe, "I'm being accused of a felony. Are you telling me I have to defend myself against an accusation of a felony, and that anything I say could later be used against me in court, and I am not allowed to talk to a lawyer?"

"Correct," replied Menon.

"So are you saying I have to choose between my desire to stay in school and my right not to self incriminate?"

"I'm sorry, I can't help you," said Menon.

54.     Later, when Doe would try to switch advisors and approach a law professor at Yale, his dean threatened him that approaching the professor would make him liable for breaching confidentiality and could subject him to discipline.

55.     Through this instruction, Yale prohibited students accused of criminal conduct from getting legal advice of their rights, thereby making them especially

---

8

https://web.archive.org/web/20140301064828/http://provost.yale.edu/uwc/procedures

susceptible to self incriminating themselves in future criminal proceedings. Menon's threat that talking to a lawyer would subject Doe to discipline was also false. Yale had no legal ability to prevent accused students from consulting attorneys, and, indeed, Yale did not explicitly say students were prohibited from doing so in their Procedures. Through this ploy, Yale kept control of the process, and endangered accused students to potential criminal liability. Yale has since revised this policy to allow students to retain outside legal counsel as advisers, although they still cannot speak on behalf of the parties.

56.     Yale appointed a local attorney to be the neutral factfinder. As Doe would later find out, the attorney was a prosecutor. Yale's other go to factfinder is a Yale Law graduate who gave up a lucrative career in law to work as a therapist for victims of sexual assault at Yale's Child Study Center. Through choosing these factfinders, Yale demonstrated that they are trying to tilt the field in favor of complainants. Despite procedures calling for neutral factfinders with no formal connection to Yale, Yale chose factfinders with inherent biases towards respondents, and even factfinders with connections to Yale. As a prosecutor, the "neutral" factfinder is naturally trained to make a case that the accused is guilty, not to neutrally gather facts. As a therapist for victims of sexual assault, Yale's other factfinder could hardly be said to be neutral, as her career is invested in supporting, sympathizing, and seeing the world through the perspective of victims of sexual assault.

57.     Indeed, the prosecutor factfinder would go on to take several biased actions in his report. After his initial interview of both Roe and Doe, he reported to Doe that the complainant alleged as she wrote in her initial complaint: Doe had physically forced her into his bed by pulling her on top of him. When Doe vehememtly denied this, the prosecutor questioned Roe about this aspect of the allegation, and Roe changed her

allegation. This time she alleged that Doe had held her hand and "guided" her on top of him, but that she had lost her ability to resist. In his final fact-finding report, the prosecutor wrote only Roe's second allegation, whitewashing that Roe changed her allegation between the two interviews.

58.     The factfinder made another egregious error.  When interviewing Doe about the words he used before Roe entered his bed, Doe responded that he negotiated with her for sex. The factfinder's responsibility was factfinding, and reporting his findings. Instead, the factfinder made conclusory and false remarks, determining that Doe's using the word "negotiated" to describe his asking for sex that night indicated that Doe received something less than a clear expression of consent. Negotiate, however, according to the first legal definition of the term found on Google, and in common understanding, means: give-and-take discussion or conference in an attempt to reach an agreement or settle a dispute[9]. Why the factfinder would assume negotiate thereby indicates non-consent, or why he would conclude that that was Doe's intention when using the word, is incomprehensible without assuming prejudice on the factfinder's part. Moreover, the factfinder's job was to report that Doe used the word negotiate, not to draw conclusions as to the consensuality of events that night from Doe's use of the word. That was a determination reserved for the panel to make.

59.     Additionally, Doe reported to the panel thirty different instances where the factfinder misreported or twisted his words.

60.     As Doe would later allege in his appeal based on witness testimony, the factfinder also left out specific information that would cast a negative light on Roe.

---

[9] http://legal-dictionary.thefreedictionary.com/negotiation

61.     During this time, Roe began approaching Doe's friends, telling them one by one that Doe had physically forced her to have sex with him and raped her. This was false, as Roe herself would later admit, and knowingly elevated Roe's allegation falsely from one of legal, if unexemplary, behavior to a felony, creating a hostile and unwelcoming environment for Doe on campus. In one instance, a chaplain employed by Yale, and who Roe went to for counseling, reportedly called for Doe's castration. When Doe brought this harassment to Yale's attention, Yale refused to do anything about it. Yet, according to Yale's Undergraduate regulations, harassment, which includes defamation, is forbidden and subject to discipline[10]. Further, Roe's actions were prejudiced against Doe on the basis of sex, as she manipulated the campus's strong feminist fervor to gain social currency and sympathy as a rape victim, and to malign Doe as a danger to women. For the next few months, many of Doe's friends would think Doe had committed felony rape and avoided Doe, thereby creating a hostile environment on campus for Doe, which Yale knew about but ignored, in violation of Title IX, as interpreted by OCR, which interprets Title IX to mandate that universities take all necessary steps to eliminate hostile environments on the basis of sex from campus. After the hearing, Yale knew that the information Roe spread was false,

---

[10] http://yalecollege.yale.edu/sites/default/files/files/URegs%2013-14_91013(1).pdf

E. Harassment, intimidation, or coercion
Acts of harassment, intimidation, or coercion, including harassment on the basis of race, ethnic origin, gender, or sexual orientation.

I. Misconduct at a formal hearing

Deliberate and knowing misrepresentation or lying during a formal hearing conducted by University authorities.

but took no steps to stop Roe from defaming Doe or correcting the hostile environment created by Roe's knowingly disseminating false information.

62.     Roe also told friends of Doe that Doe sent her "nasty texts." Doe, and subsequently Roe, submitted their entire text communications to Yale, and none of Doe's texts could be construed as nasty. This was another point where Roe demonstratedly lied and defamed Doe to his peers, yet Yale refused to penalize Doe for this defamation or rehabilitate the hostile environment Roe created for Doe on campus.

63.     Yale did not follow their Procedures or allow for a fair hearing in other ways. UWC policy dictates that seven days are to be given between the delivery of the factfinder's report to the parties and the date of the hearing, to give the parties enough time to prepare a response to the report. On Monday, May 12, Yale notified Doe that the hearing was scheduled for Thursday May 22.  Given Yale's mandated minimum of seven days time between receipt of the factfinder's report and the date of the hearing, Doe expected the factfinder's report to be delivered no later than Wednesday May 14, to have seven full days before the 9 am hearing. On Friday, May 16, Yale notified Doe that the factfinder's report was delayed, and that he would receive it no later than Sunday, May 18. The factfinder's report, however, was not delivered to Doe until after 7 pm on Monday May 19, giving Doe about 2 and a half days to prepare for the hearing after receipt of the report, four and a half days less then the seven he was entitled to. Yale offered to postpone the hearing, but did not give Doe an alternate date, and placed the onus on Doe to cancel the scheduled hearing, placing pressure on Doe not to inconvenience the schedules of the ten other people who's schedules were already set on the May 22 date. Doe felt tremendous pressure to attend the

May 22 hearing, thereby forfeiting his right to review the evidence and prepare appropriately for the meeting with seven days time.

64.     Additionally, Doe was not informed until less than 24 hours before the hearing that he was allowed to present his opening statement in written form. Doe's university appointed advisor had apparently been unaware of this possibility, and Doe was only informed backhandedly, the day before the hearing, by Menon, the UWC secretary, after he asked her how to present his opening statement. The complainant, however, was apparently informed of this possibility with enough forewarning that she was able to present her opening statement in written form.

65.     On information and belief, this is a pattern resulting from Yale's imbalanced resources for allocating university advisors to complainants and respondents. Complainants have access to advisors from Yale's SHARE office, an office at Yale designated specifically to supporting survivors of sexual assault; these advisors are therefore specifically trained and experienced in how Yale handles sexual assault complaints through the UWC. Respondents, however, do not have access to advisors similarly trained or experienced, and have to rely on the amateur experience of ad hoc advisors from University faculty. This discrepancy gives great advantage to complainants, in contravention to OCR guidelines that instruct that Title IX requires equality of process. Indeed, in Mr. Jack Montague's recent filing against Yale University before this court, he alleges the same fact pattern: he was uninformed that he was allowed to present a written statement, but that the complainant in his case was informed of this information and did indeed present a written statement.

66.     Doe's Yale appointed advisor displayed other inadequacies that led to Doe preparing a subpar defense. For example, he told Doe "because it takes two tango, Doe had clearly done something wrong and was guilty of something, and, unless he is the gentleman in the room and takes responsibility for his actions that night, Yale would expel him, because Yale is first and foremost an educational institution. If Doe displayed that he wasn't "getting it" and was recalcitrant in maintaining his innocence, the panel would determine that Yale is not a place where he belongs."

67.     At Yale, defendants are told, a defendant is guilty by accusation, and if he won't admit some form of guilt that itself is reason to expel him, because such bone-headedness makes him unfit to belong to an educational institution.

68.     On information and belief, Yale uses another tactic to tilt the playing field in favor of female complainants. Yale's panel is required to have five panelists. In all four panel hearings that Doe is knowledgeable of, all of which had female complainants and male respondents, three of five panelist were female. Using a majority female panel may be a strategy by Yale to increase the likelihood of rulings in favor of the female complainants.

69.     Yale further displayed anti-male bias when Doe complained that Roe had previously assaulted him when he refused to have sex with her. Yale itself refused to investigate this complaint, neither on its own merits, nor in how it may have affected Doe's decision to ask for sex on the night of March 6. When Doe mentioned this assault to his dean-advisor, his dean smiled, and stated, "She's smaller than you. What were you scared of? The panel's not going to take you seriously." From this dean's point of view, female on male violence is a laughing matter and not taken seriously at Yale, and would only serve to embarrass the male who complains of it.

70.     While Yale mandates and provides all incoming freshmen with training on Yale's standard of consent, Yale did not provide this training to Doe when he matriculated at Yale. Yet Yale expected him to be just as informed of the intricacies of Yale's standard of consent even though Yale denied him this training and even though his upbringing would not have exposed him to the intricacies of Yale's exceptionally high standard of consent .

71.     Doe's panel was comprised of two professors, one in sociology and one in English, an administrator from the university billing department, and two graduate students, from the biology and literature departments. Doe was not allowed to record the hearing, was not allowed to consult a lawyer or have his advisor represent him or speak for him, and was not allowed to directly cross examine his accuser. He was told that remaining silent would be taken as admission of guilt, and could itself be used as the evidence to find him guilty. He had to remain in another room separated from the complainant, and was allowed to submit questions to the panel only at the end of the hearing, but which the panel exercised the right not to ask, and, indeed, decided not to ask all of them. The complainant was allowed to submit witnesses' written testimony of hearsay which the witnesses heard from the complainant herself, and Doe was not allowed to cross-examine these witnesses. One witness also remained anonymous. It was never explained to Doe how he could submit witness testimony for himself if university confidentiality policy prohibited him from telling anyone about the nature of the procedures. He was initially told to provide his side of the story without knowing the details of the accusation. Later, he was subject to double jeopardy when Yale allowed his accuser to appeal the findings. Yale also precludes testimony on character or any information bearing on the complainant's mental health into the proceedings.

72.     As will be discussed below, John's statements and evidence in his favor were given lesser weight than those of Roe's and in some instances disregarded entirely, despite the fact that Doe maintained a consistent narrative from the very beginning of the process, from when he submitted a full length, detailed version of the events within five days of receiving the initial complaint, through the very end of the process.

73.     At the same time, Roe's statements were valued disproportionally to their inconsistencies. Indeed, the factfinder and panel omitted Roe's changing claims in their respective investigative report and panel findings, without questioning her inconsistencies. Roe repeatedly changed her central allegations, initially claiming Doe committed felony forcible rape, then changing that allegation to "he pulled me on top of him" (without force), then to "I got into his bed because I wanted him to be nice to me." In this way her witnesses also ended up testifying against her final allegations, as they testified she had told them Doe had forcibly raped her.

74.     In doing so, Yale abdicated its duty to thoroughly weigh Roe's credibility and impartially determine when Roe, a confessed liar, was lying to them.

75.     In another case with a female complainant and a male defendant, outlined in Montague v. Yale, the panel explicitly credited the female complainant's account "because the complainant seemed able to remember the incident very clearly; indeed, the panel found, 'there is no evidence [Roe] was intoxicated or otherwise impaired in any way that would have affected her recollection of the night.' By contrast, the panel did not find Mr. Montague credible 'because of his selective memory . . . and his shifting recollection of how he gauged consent.'"

76.     Yet, in this case, with a female complainant and a male respondent, Yale chose to credit the female's shifting narrative and discredit the male's consistent narrative. The most reasonable explanation of this paradoxical and inconsistent set of determinations is the female gender of the credited party and the male gender of the discredited party.

77.     Also overlooked by Yale's investigation were Roe's feelings about John sleeping with someone else and ending their relationship, and whether jealousy and anger may have been a motive for Roe to express so many inconsistencies and embellishments to her claim. Yale also refused to review the evidence Doe submitted in his defense, his and Roe's entire communication history, which Doe alleged showed the history of Roe's abuse and coercion of John for sex and served as a model of the way Roe treated John on the night of March 6-7.

78.     On information and belief, Yale has never made findings that a complainant has lied, nor has ever questioned a complainant's victimhood status, even when the facts show otherwise or even when finding for the respondent, and will always make findings that don't question the sincerity and complainant's perception of victimhood, no matter how compelling a case has been made that a complainant fabricated allegations and claims. Whenever there are indications that a complainant has lied, Yale will hide this fact through omission and manipulation of process. This creates an unequal process as accusers know they can lie and face no negative repercussions. This also creates a hostile environment for falsely accused men, as Yale will in no way correct a hostile environment created by a false allegation.

79.     During the hearing, Doe was relieved when Roe admitted that she followed him to his room, and could have left, but she chose not to. Roe then burst out crying,

blaming herself, saying, "He asked me for sex, and I could have left, and I just didn't. I don't know why. I could have left, but I wanted him to be nice to me so I got into his bed." By admitting that she could have left but chose not to and instead chose to enter Doe's bed because she wanted him to be nice to her, Roe admitted that until this point she had falsely accused Doe of felony rape by forcing sex on her, in her first iteration, and of coerced sexual assault, in her second iteration, when she claimed he "pulled her on top of him."

80.     The panel, however, chose to look at the meta-meaning of Roe's crying admission of consent and of false accusation, and instead used that instance to indicate a greater truth: Roe's crying was indicative that Roe is a crier, and that her claim that she was crying uncontrollably throughout her encounter with Doe that night was true, stating "In fact, the panel observed that Ms. Roe was crying through much of her retelling of the incident to the panel."

81.     The panel hid the fact that Roe began crying when Roe admitted she lied and took responsibility for not leaving and willingly getting into Doe's bed after he asked her for sex.

82.     When Doe submitted questions at the end for panel to ask, the panel selected only one or two of Doe's questions.

83.     The panel credited most of Roe's version of events that night, despite stating that even if "Roe said "yes" or "ok" [to Doe's request for sex] and the fact that Roe got into bed without being physically forced provide some basis for Doe's expectation and understanding of consent, a reasonable person would not assume that Roe had given "positive, unambiguous, and voluntary" agreement:  the fact that the argument they had been engaged in for the past hour and a half was still unresolved, that she was still visibly

upset, shaking, and crying, and, as acknowledged by both parties, that she had stated in response to what she experienced as his demand for sex, "How can you do this, I'm too upset."

84.     The panel used several evidentiary points to make this determination:

- That her crying at the hearing buttressed her claim that she was crying throughout the night in question.

- That she had said in response to his initial request for sex " How can you do this, I'm too upset."

- That she used the word rape to describe the encounter to a friend shortly after and that she had later used this terminology to accuse Doe in person, and again later with another friend. And that she later tested herself for STDs and visited the SHARE[11] center.

- That Doe had proposed that they follow up later that day to discuss the events the previous night, because, as he explained, he knew there was still unresolved anger between them.

85.     According to the panel, if one partner is upset at the other partner, that partner cannot consent to having sex while upset. This means that "angry sex," a genre of sex commonly understood to be consensual, where one or more of the participants are upset at the other during sex, is definitionally non-consensual according to Yale.

86.     None of these points were indicative of non-consent. Doe denied that Roe was crying that night, and that, even according to her claim that she was crying throughout the encounter, in her narrative, her crying was because she thought Doe was not being

---

[11] Yale's sexual assault survivor's support office.

"nice" to her, not because she didn't want to have sex. Additionally, Doe spent upwards of ten to fifteen minutes promising he'd be "nice" to her after her initial refusal. Apparently, according to Yale, once someone refuses sex, they cannot later change their mind and consent. While Doe never claimed that he resolved the argument before sex, he did claim that he appeased her sufficiently by promising multiple times that he would be nice to her in response to her demands that he do so.

87.     Even though when she told her friends Doe raped her she also claimed Doe used force, which she later admitted was false, and that consequently Doe had not in fact raped her, her falsely claiming to her friends that she was raped was seen as evidence of the greater truth that she felt raped, and therefore evidence that, in spite of the fact that there was no force and she consensually got into his bed after he asked her for sex, she wasn't truly consenting, and Doe should have known that.

88.     After the panel found against him, Doe approached Yale Law Professor Jed Rubenfeld to inquire about the meaning of consent, so he could present a better defense in the remainder of the proceedings. Doe told his dean he was going to talk with Rubenfeld, and his dean got angry with him, threatening him that if he approached Rubenfeld that would be a violation of Yale's confidentiality policy, in contravention to Doe's lawful rights and as allowed for by Yale's confidentiality policies. Doe ignored his dean and approached Rubenfeld anyway. After Rubenfeld read the findings of the panel, he suggested Doe replace his university appointed adviser with himself, which Rubenfeld interpreted to be permissible according to Yale policy. Doe didn't want to upset his dean by telling him that he had replaced him as an adviser, and so submitted his response later that week without first running it by his dean or asking his dean for advice. When Doe told his dean in the

following days that he had submitted his response, his dean got angry with him, saying, "John, if this is the way you treat women, no wonder they are upset at you."

89.     Rubenfeld asked the Yale College Dean and Final Decision Maker if he could submit a letter on behalf of Doe, as according to his reading of the policy at the time, this was permissible. The Yale College Dean responded that Doe could submit Rubenfeld's letter as part of his own response. Later, to prevent this from happening again, Yale made an explicit policy prohibiting advisers from submitting any written material on behalf of their advisee.

90.     In his letter, Rubenfeld first articulated how he was made aware of the case and why he was presenting his letter. He then reviewed the case as follows:

> The core facts here are <u>undisputed</u>.  I want to stress as strongly as possible that, in my judgment, reasonable people will be very troubled – perhaps outraged – if on these facts a student at Yale were found guilty of engaging in sexual intercourse without the other party's consent.   There was no finding of any intoxication, force, threat, or harassment in this case.   Instead, the undisputed facts (as found by the fact-finder and confirmed by the hearing panel) are:
>
> - that the complainant and Mr. D had had consensual sex on many past occasions;
> - that on the night in question, the complainant asked Mr. D if she could come to his room and went there "*with the expectation that they would have sex*;"
> - that after arriving at Mr. D's room, she *consensually* performed oral sex on him;
> - that the two then had a heated argument, lasting perhaps an hour and a half, precipitated by Mr. D's disclosure that he had slept with another young woman earlier in the semester;

- that the complainant was extremely upset at learning that Mr. D. had not been "monogamous";
- that Mr. D. *sought to terminate the encounter by going to bed*;
- that *he went to his bedroom (a separate room) and did in fact get into bed*;
- that the complainant *followed him to his bedroom*;
- that Mr. D, from his bed, then expressly "*asked her to have sex*";
- that *without force of any kind the complainant voluntarily got into his bed*, clothed in a sweater and underwear; and that over the next 20 to 30 minutes, *again without any finding of force or threat of force,* that the two had sexual intercourse.

To repeat: those are the <u>undisputed</u> facts – i.e., the facts to which both parties, the fact-finder, and the hearing panel all agree.  And these facts will strike many reasonable people as making out a clear case of consensual sex.

The hearing panel found that the complainant was still very upset when she got into Mr. D's bed; that she remained upset during the sexual intercourse that followed; and that after sexual intercourse began, Mr. D spoke words that caused the complainant emotional turmoil and pain.  But I'm very concerned that the hearing panel confused these asserted facts with a lack of consent to sexual intercourse.

In short, I think a very serious mistake has been made, a mistake that, if not corrected by your office, could have extremely negative effects for Yale, including potential legal liability as well as detriment to Yale's ongoing efforts both to deal with the very real problem of sexual assault on campus and to respond fairly and effectively to claims of sexual misconduct.

<u>The Hearing Panel's Findings of Sexual Misconduct</u>

The primary finding of sexual misconduct made by the hearing panel was a finding of nonconsensual sexual intercourse: specifically, that the act of sexual

intercourse engaged in by Mr. D. with the complainant on the night of March 6th occurred without the complainant's consent.

Although the hearing panel did not use the term, it is very important for your office to understand that the hearing panel thereby found Mr. D. guilty of *sexual assault*. As quoted above, Yale defines sexual assault as including "*any kind of nonconsensual sexual contact*." Obviously, sexual intercourse is an instance of "sexual contact." Nonconsensual sexual intercourse is, therefore, sexual assault. It follows that when the hearing panel asserts that Mr. D's act of sexual intercourse with the complainant on March 6th was "nonconsensual," the panel is asserting that Mr. D committed sexual assault. There is no way around this conclusion.

I believe the panel may not have understood this. They may not have understood that Yale's sexual misconduct provisions are carefully and expressly drafted so that a fact-finder cannot find an act of sexual intercourse to have been nonconsensual *unless the fact-finder is prepared to conclude that the accused party is guilty of sexual assault*. It is imperative that your office understand this point – because sexual assault is an extremely serious accusation, and Mr. D. by no stretch of the imagination committed it.

Based on a careful reading of the panel's report, I believe that if the panel were asked, "Did you conclude in your report that Mr. D committed sexual assault?", one or more of the panel members – perhaps all of them – might well answer, "No." (Note: if you wish, your office has the express authority to ask the panel members this precise question, in order to clarify their findings.) If this is so, then their finding of non-consent must be reversed. If any of the members of the panel did not believe, or did not mean to be saying, that Mr. D committed sexual assault, the panel's finding of nonconsent must be reversed – because that would mean that the panel did not fully understand Yale's sexual misconduct provisions, did not fully understand the role and meaning of nonconsent in those provisions, and did not fully understand what it was purporting to find.

In any event, given the undisputed facts of this matter, Mr. D. cannot possibly be said to have committed sexual assault. It is undisputed that he tried to end the parties' encounter by going to bed. It is undisputed that the complainant followed him to his bedroom. It is undisputed that he then "asked her to have sex." That was an express, unambiguous request; there is no claim and no possibility that the complainant did not understand that Mr. D. was asking her to come into his bed in order to have sexual intercourse with him. There is a dispute about the exact words that were then exchanged (the complainant has stated that her initial reaction was to say that she was too upset to have sex), but it is undisputed that Mr. D continued to ask her to come into his bed expressly to have sexual intercourse, and that, after certain words were exchanged, whatever those words were, the complainant did in fact voluntarily got into his bed. There is no finding that the complainant revoked her consent at any time thereafter.

Under Yale's sexual misconduct provisions, consent is defined as a "positive, unambiguous, and voluntary agreement to engage in specific sexual activity." In fact, Mr. D states that the complainant expressly, verbally agreed to have sex before getting into bed with him – saying "yes" or "okay" to his request that they have sex – *and the panel did not conclude otherwise*. Specifically, the panel was "unable to determine by a preponderance of the evidence whether [the complainant] said these words ['yes' or 'okay']." (Panel Report at p. 3, n.2.) In other words, the panel is acknowledging that the complainant may have said "yes" or "okay" in response to Mr. D's asking her to have sex; the panel's position is evidently that *even if the complainant did in fact say "yes" or "okay"* after being asked to have sex, that would still not be consent.

That is not a tenable position. "No" has to mean "no," but similarly it has to be reasonable for a party to understand "yes" to mean "yes."

The panel evidently believed that if the complainant initially said she was too upset to have sex, and if she was crying at the time she got into bed (for the record, Mr. D. denies that complainant was crying), then Mr. D could not reasonably have construed her eventually saying "yes" or "okay" to sex, and her voluntarily getting into his bed

(after he had asked her to come into bed expressly to have sex), as an unambiguous consent.  (Panel Report, at pp. 3-4.)  This too is not a logically or morally tenable position.  No matter how upset one party may be with another individual's perceived infidelity, that party cannot say "yes" or "okay" to a request to have sex with that individual, then voluntarily get into bed with that individual, then (without any force or threats of any kind) have sex with that individual – and then later assert that the sex occurred without her consent.  Yet that is the implication of the panel's report.

Once the panel decided that it could not determine whether the complainant had or had not said "yes" or "okay" to sex, the panel should then have concluded – the panel was required to conclude – that it could not find the parties' sexual intercourse on the night in question to have been nonconsensual.  Its failure so to conclude was clear error.

Moreover, Yale's sexual misconduct provision expressly states that consent need not be verbal ("a clear 'yes,' *verbal or otherwise*, is necessary").  Even if complainant did not say the word "okay" or "yes," it was reasonable for Mr. D to believe that she had nonverbally communicated "a clear 'yes'" to sex.  To repeat: on the undisputed facts, after Mr. D had tried to end the encounter by going to bed, and after the complainant had followed him into his bedroom, Mr. D. expressly asked her to have sex; there was no ambiguity in this request; Mr. D. was asking the complainant to have sexual intercourse with him; the complainant so understood him; there followed an exchange of words; Mr. D. continued to ask her to come into bed to have sex with him; and then the complainant voluntarily got into bed with him.  A reasonable person could clearly have believed, given these actions, that the complainant was positively, unambiguously, and voluntarily agreeing to have sex with Mr. D.  To conclude otherwise would be to require that consent must always be verbalized, whereas Yale's provision expressly allows for nonverbal consent.

I want to reemphasize that to find nonconsent here is to find Mr. D guilty of sexual assault, and it is simply impossible, given the undisputed facts of this case, to conclude that Mr. D committed sexual assault.

Yale's Potential Legal Liability

Very briefly, I want to note my concern that the panel's finding of nonconsensual sex may reflect gender bias.  One method that lawyers and social psychologists use to think about whether gender bias has affected a judgment is to hypothetically reverse the genders of the parties and ask whether the judgment would have remained the same.

In other words, suppose that the complainant, a female student, had taken the actions that Mr. D. took, and that Mr. D had taken the actions the complainant took. Suppose, then, on the night of March 6th, the complainant, a female student, sent text messages to Mr. D., a male student, saying that she did not want to have sex with him that night because she had to study for a midterm the next morning; that Mr. D. nevertheless went to her room "with the expectation that they would have sex;" that a fight ensued when Mr. D. found out that the complainant had slept with another man earlier in the semester; that Mr. D. grew furious, demanding an apology and insisting that the complainant was permitted to have sex only with him; that after an hour and a half, the complainant tried to end the altercation by going to her bedroom and getting into bed; that Mr. D. followed her into her bedroom; that the complainant then proposed sex not because she wanted to have sex with Mr. D., but because she felt she had no other way to get him to leave her alone and let her sleep before her midterm; that Mr. D. then demanded that the complainant promise "to be nice" to him; that the complainant made this promise, again because she felt coerced into doing so; and that the two parties then had sex.

Which of these two parties would be accused of sexual misconduct – of forcing nonconsensual sex on the other – if the genders were reversed in this way?  I am very concerned that, with the genders reversed in this way, the case would be seen in a startlingly different light.

In other words, there is a serious concern in this case that gender bias may have caused the panel to see Mr. D as the aggressor, instead of seeing the complainant as the aggressor. If so, then unless your office overturns the panel's finding, Yale may be accused of discriminating against Mr. D on the basis of his gender. Such discrimination would be a serious violation of federal law, subjecting Yale to potential liability.

91.    In addition to Professor Rubenfeld's points in his letter, it is worth noting that according to the Roe's testimony, she got on top of Doe, which means she initiated sexual activity, not Doe. Yale chose to place the burden of obtaining consent on Doe, who, according to Roe, was lying prone on his bed when she got on top of him and initiated sex. Yale requires consent for sexual activity, but yet, Doe, who was lying prone on his bed according to Roe, did not engage in sexual "activity" at this point, she did. According to Yale's finding, then, it was Doe's obligation to throw Roe off of him and stop her from performing a sex act on him, even though he took no physical action to initiate the sexual activity. Roe, on the other hand, who initiated the actual sexual activity by climbing on top of Doe, was seen as passive, and not obligated to receive consent to perform a sex act on Doe.

92.    Yale refused to penalize Roe for her actions preceding sex on the night of March 6-7. Yet Yale defines sexual harassment to include:

> verbal or physical conduct of a sexual nature on or off campus, when: ... or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating or hostile academic or work environment.

93.    The nature of the conversation was sexual as Roe was demanding Doe can only sleep with her, and directly interfered with Doe's academic performance, as Doe

explained to Roe repeatedly before they met that evening and over and over again later

that night that he needed to use his time to study for an exam the following morning.

94.     Roe's undisputed conduct also violated Yale's policy of student behavior as

outlined in the following policies in Yale's Undergraduate Regulations[12]:

> C. Acts of violence or physical force
> Physical restriction, assault, or any other act of violence or use of physical force
> against any member of the community, or any act that threatens the use of violence
> or physical force.
>
> E. Harassment, intimidation, or coercion
> Acts of harassment, intimidation, or coercion, including harassment on the basis of
> race, ethnic origin, gender, or sexual orientation.
>
> N. Theft and willful property damage
> Obtaining or exerting unauthorized control over the property of others, or the
> destruction of, or damage to, the property of others.

as well as behavior defined by Yale as Intimate Partner Violence (IPV). According to Yale,

intimate partner violence includes[13]:

> Harassment – following or stalking, refusing to leave when asked
> Coercion – making the victim feel guilty, pushing the victim into decisions, sulking,
> manipulating
> Verbal Abuse – constant criticism... jealousy... yelling, swearing... stormy
> relationship

95.     The undisputed facts of the case, and even Roe's own narrative, show that

Roe met these definitions for committing IPV.

96.     She harassed John when he repeatedly asked her to let him study and again

when he later asked her to let him go to sleep and she refused to leave or let him sleep and

---

[12] http://yalecollege.yale.edu/sites/default/files/files/URegs%2013-14_91013(1).pdf

[13] http://sharecenter.yale.edu/sites/default/files/files/SHARE_Center_infocard_IPV_14.pdf

followed him and cornered him in his room and continued to refuse to leave or let him sleep, despite his many pleadings that she do so, fulfilling the "following" and "refusing to leave when asked" definitions of harassment.

97.     She coerced John through making John feel guilty, pushing him into decisions, sulking and manipulating.

98.     She verbally abused John through jealousy, yelling, swearing, and maintaining a stormy relationship.

99.     Roe's behavior throughout her text message history with Doe also included harassment, coercion, and verbal abuse as defined by Yale's definition of intimate partner violence, which Doe never reciprocated; he always showed patience and forbearing throughout their text communication history. Doe submitted this entire communication history to demonstrate that Roe's long term behavior included these elements of IPV, and that despite this abuse he maintained his composure and forbearing throughout--to serve both as evidence of Roe's abusive behavior in general and as evidence of what likely occurred on the night of March 6-7--but Yale refused to examine the text message history.

100.    Yale thereby failed to be thorough and impartial by not making any finding with regard to material and relevant events that may have been supportive of John's allegations and contrary to Roe's allegations.

101.    As Doe showed through their communication records, Roe consistently and unreasonably harassed Doe for sex, especially during times that interfered with Doe's academic work and when Doe was most pressured to maintain a high level of academic performance, such as during exam period. Her persistent harassment during finals period of the fall semester played a major part in Doe not submitting a term paper on time, leading

to him receiving an F which remained on his transcript throughout the time of the hearing process with Roe, until Doe successfully petitioned Yale to accept his paper the following year.

102.   Doe also alleged other incidents that factored into his decision-making on the night of March 6-7, such as previous behavior of Roe's that met Yale's definition of IPV, and her refusing to end long, circuitous conversations on nights when Doe had final exams and term papers due and Roe wanted sex, and Doe futilely tried explaining why he couldn't sleep with her during final exam week.

103.   Additionally, Yale refused to consider Doe's allegation that Roe had previously assaulted him for refusing to continue having sex with her, an aggression which violated all the above college regulations, met the IPV definitions of Harassment, Coercion, Verbal Abuse and, additionally, "Physical Abuse – hitting, slapping... pushing, punching beating." Yale also refused to consider how this previous abuse may have factored into Doe's decision making on the night of March 6-7.

104.   When the genders are neutral, Yale explicitly says that in a situation of intimate partner violence, context matters, and any individual action, even violence, should be weighed against the backdrop. For example, Yale advises someone who commits violence in response to IPV as follows:

What if I Hit Back?

Sometimes a survivor of intimate partner violence will react to the abuse by defending him or herself. This does not make this person an abuser because he or she is not trying to set up a system of power and control. **Behavior done to protect or defend oneself should be seen as a harm reduction or survival technique, not abuse.** The abuser may say, "See, you are just as bad as me." He or she may point to a particular incident, but what matters is what is going on over time.

**Ask yourself:** Who is being exploited? Who feels entitled? What is the net effect of the relationship on each person's life?[14]

105.     According to Yale's own guidelines, the panel was required to ask: "What is going on over time?" The panel, however, decided to act as Yale warns an abuser may act: by pointing to a particular incident, independent of its context, and saying, see? As Yale itself cautions, what is important is not the freeze-frame, but the context. Yale's failure to consider the context and the general pattern of events in their weighing of the events on the night of March 6-7 was a failure to meet Yale's own standards and guidelines, and indicates Yale was blinded from seeing Doe as a victim due to the school's ingrained gender bias which sees women as victims and men as aggressors.

106.     Yale not only refused to consider that John may have been the sole victim on the night of March 6-7, as a victim of IPV and non-consensual sex, Yale also refused to consider how IPV may have affected John's actions, as their own policy dictates, in the context of the clear and continuous IPV which Roe perpetrated against John.

107.     Indeed, Yale ignores how IPV affects men in select public literature on the issue. For example, in one prominent brochure[15], Yale lists the definition and common behaviors of IPV, then lists IPV statistics, copied here in their entirety, as follows:

- The Department of Justice found that women ages 16 – 24 are the most likely victims of IPV
- IPV is the leading cause of injury to women

---

[14] http://sharecenter.yale.edu/sexual-misconduct-information/forms-sexual-misconduct/intimate-partner-violence/what-if-i-hit-back
[15] http://www.cis.yale.edu/yuhs/med_services/share/documents/IPV_flyer.pdf

[The End]

108.     The flyer includes no statistic or mention of how IPV affects men, implying that Yale sees IPV solely as an issue affecting women, and that Yale maintains a blindness as to how IPV affects men. Whether this flyer is a result of Yale's culture of indifference to how IPV affects men, or whether it contributes to such a culture, this flyer is indicative of prejudice on Yale's part towards male victims of violence, in favor of a culture of female victimhood. This is in spite of the literature indicating that male victimhood of IPV is prevalent, and in the case of non-violent IPV, more prevalent[16] than female victimhood.

109.     Despite the demonstrated past history and pattern of events on the night in question, and in direct violation of such federal and state laws as well as its own Policies, Yale's treatment of John was discriminatory and motivated by sexual bias. As such, Yale exercised stereotypes that favored and discriminated against John, such as assuming he was agentic and angry, that he possessed control over the situation and was sex starved and demanding, and that Roe was passive and crying, a damsel in distress, with no control or responsibility over her actions that night, despite a fact pattern that indicated the opposite.

110.     Yale also maintains a double standard when it comes to making findings against complainants. Aley Menon, secretary of the UWC told Doe that a false allegation made by a complainant or other violation of University policy can only be punished if a separate formal complaint is filed by the respondent alleging these facts. However, David Post, Chair of the UWC, in another complaint process, refused to allow a counter complaint alleging the complainant made false allegations, stating that Yale will only hear a complaint

[16] https://www.cdc.gov/violenceprevention/pdf/nisvs_executive_summary-a.pdf

involving the same series of events once. Yale employs this catch-22 to protect

complainants from counter allegations over their honesty or other perpetrations.

111.    According to Aley Menon, the UWC Secretary, Yale does not consider it

possible that the respondent of a complaint is actually the victim when a complaint is filed

with the UWC.

112.    Yale applies the "preponderance of the evidence" standard unequally for

findings in their proceedings, in favor of the accuser. According to Aley Menon, the

Secretary of the UWC, the preponderance of the evidence standard used by Yale means

there is no burden of proof in UWC cases. The panel is simply asked: "Whose story do you

believe more?" In other words, there is no presumption of innocence in UWC cases, and the

panel only has to go with their hunch of whose story they believe more. The ramifications

of this are double sided: on the one hand, this relieves the complainant of the burden of

proof to overcome the presumption of the respondent's innocence; on the other hand,

unlike a proceeding using a burden of proof, where a finding of "not guilty" does not

necessarily mean there was a finding of fact for the respondent's innocence, in Yale's

system, when any evidence is applied for a finding, a finding of not guilty is in fact a finding

of "innocent."

113.    Yet, when Yale has in the past found for the male respondent, in cases where

the complainant and respondent offered mutually exclusive narratives where only one

narrative can be correct, (such as a case with an alibi), Yale has refused to equate their

finding for the respondent as a finding against the complainant's integrity, even where the

complainant could not reasonably have been under the impression that her facts were true

if the facts the panel found for the respondent were true. That is, Yale employs a double

standard in their findings: while they are more than happy to expel a respondent on the whim of the panel's hunch, they demand a higher standard of evidence to find complainants responsible for bringing false complaints.

114.    Yale also refuses to allow respondents to bring counter-complaints, as they say they will only hear a complaint on the same fact pattern once. In this way, Yale controls the findings to only find in favor of complainants, never against them, and, in the particular instances where this actually happened, for the female, not the male. This not only shows further prejudice against male respondents, but also tilts the playing field in favor of complainants; the incentive not to lie is much less for complainants: if they change their story multiple times, this is just evidence of their trauma, and only further evidence that their alleged victimhood is true, and if the evidence points to their claims being false, Yale will control the findings of the panel to prevent a finding against the complainant. In this way, complainants know they can tack on to their stories as many distorted facts as they want; in Yale's system, this will only help them and never hurt them.

115.    Yale further presumes that respondents have more reason to lie, all things being equal, and are therefore less trustworthy than complaints. According to Miriam Berkman, one of Yale's factfinders, a respondent has less credibility because as a defendant, "he is likely to present events in the light most favorable to himself."  No such critique is extended to complainants; on the contrary, they are assumed not to be lying "because the process of bringing a complaint before the UWC is so difficult and painful she would never disclose her story if it weren't true."

116.    On information and belief, from a review of the Spangler reports on reported cases of sexual misconduct at Yale where gender is identified, and from personal

knowledge, male students have filed formal complaints with the UWC against female students only three times. All three times, Yale refused to accept jurisdiction for their complaints. Refusing to accept jurisdiction is an extremely rare decision in UWC formal complaints, of which the vast majority are cases of female complainants against male respondents, and it seems to be applied disproportionately, if not universally, against male students.

117.    By making a finding against Doe that he committed a wrong by pleading for sex after all the steps he took beforehand to try to end the encounter, Yale indicated that he must have had an available alternative that would have better resolved the situation. Yet, while issuing a condemnation of Doe's actions that night, Yale refused to inform Doe what better course of action he could have taken. This is particularly egregious because Yale claimed the high mantel of the educator: As Doe's dean instructed him, Yale is not a disciplinary institution, but an educational one; Yale's primary purpose in executing a disciplinary procedure is educational; yet, when the moment came to educate, the ostensible highest purpose of the whole disciplinary process, Yale abdicated that responsibility in favor of an unexplained unilateral disciplinary measure, indicating that Yale does not care about education in its disciplinary proceedings, but rather protecting corporate liabilities—the billions Yale retains in alumni donations and government grants. It was easier for Yale to unilaterally punish Doe to protect their liabilities than to find otherwise, even if Yale could not explain what Doe should have done differently.

118.    Additionally, on information and belief, Yale has claimed, as many other schools have, that the elimination of most due process protections for the accused is an effort not only to be more "victim friendly", but also because the school's primary purpose

in discipline is to educate, for which inconvenient things like a right to counsel and right to cross examine their accuser get in the way, as they create an adversarial environment, not an educational one. Yet, as Yale showed, they have no interest in educating, just protecting corporate liabilities. The rights of respondents are stripped, in an Orwellian fashion, on the altar of a promised "education" when in fact Yale just wants control of the process and the ability to find respondents responsible if politically or corporately expedient.

119.    Informing Doe what he did wrong in light of his alternative options was not just an educational matter but a judiciary responsibility. It is absurd that one should be punished for a situation where they had no free will or better options; a finding of responsibility for a wrongful action can only be judged against the failure to pursue available, better-exercised alternatives. Yet, Yale never articulated an alternative course of action that Doe could have or reasonably should have known to execute in the moment in question. Particularly egregiously, when Doe asked Yale's UWC Decision Maker what he should have done in the situation, the Decision Maker responded: "I cannot promise that a satisfying answer, much less even an answer, will be forthcoming." This abdication of judicial responsibility not only showed Yale's disinterest in its self proclaimed primary role of educator, but also displayed a gross lack of judicial responsibility; further indicating that, according to Yale, Doe was damned if he did, damned if he didn't. No matter what Doe would have done in that situation, no matter what kind of corner he was pushed into, and no matter what he suffered in IPV, the responsibility was on him due to his being the male in the situation. It was easier for Yale to hand out a unilateral penalty against the male than to do the tedious work of actually examining Doe's options in light of the broader context.

120.    Yale penalized Doe by issuing a probation for non-consensual sex, which, as
Professor Rubenfeld explained, is Yale-speak for sexual assault.

121.    Yale has recorded in Doe's permanent record that Doe was found responsible
for "non-consensual sex," which is a serious liability for admission to graduate school or
obtaining employment.

122.    Yale also failed to protect John's privacy as mandated by FERPA. According to
FERPA, Yale must keep all matters related to a student's educational record confidential.
Yet, Yale shared their disciplinary findings with the complainant. 20 U.S.C. §
1232g(b)(6)(A) **(A)** [17], states that there is an exception to FERPA when there is a crime of
violence or non-forcible sex offense, neither of which was present in this case. Yale had an
obligation to its students, Doe included, that it would abide by FERPA regulations, but
violated these obligations in their pursuit of discipline. OCR, in its 2011 DCL states that
Title IX overrides FERPA requirements when "the sanction directly relates to the harassed
student. This includes an order that the harasser stay away from the harassed student, or
that the harasser is prohibited from attending school for a period of time, or transferred to
other classes or another residence hall. Disclosure of other information in the student's
'education record,' including information about sanctions that do not relate to the harassed
student, may result in a violation of FERPA[18]."

---

[17] Nothing in this section shall be construed to prohibit an institution of postsecondary
education from disclosing, to an alleged victim of any crime of violence (as that term is
defined in section 16 of title 18), or a nonforcible sex offense, the final results of any
disciplinary proceeding conducted by such institution against the alleged perpetrator of
such crime or offense with respect to such crime or offense.

[18] http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf

123.    In this case, Roe had already graduated at the time of Yale's disciplinary hearing, had plans to be elsewhere the following year, and had no further direct relation to the sanction. Yale was therefore in violation of FERPA when it disclosed the details of its sanction of Doe to Roe.

124.    On June 27, Doe appealed the decision of the UWC. On August 14, Yale responded to Doe's appeal, denying his request.

125.    In his appeal, Doe provided newly obtained evidence that the factfinder covered up a finding that would have cast Roe's character in a negative light and also shown her to be a liar. Yale refused to consider this as grounds for appeal even though it met Yale's standard of newly discovered facts relevant to whether there was procedural error and/or facts that may undermine the accusation of sexual misconduct.  Doe also pointed to the fact that the panel considered him guilty until proven innocent as procedural error. Yale declined to approve John's request for an appeal.

126.    Over the following summer, despite Doe being able to provide witness testimony that he was a hundred miles away from Roe, Roe made unfounded allegations that Doe was stalking her and coming to murder her. Despite the unfounded nature of her paranoia, Yale followed up by warning Doe to stay away from her.

127.    On information and belief, Yale later retaliated against Doe and failed to fulfill its contractual obligations by precluding him from pursuing on campus recruiting the following semester, the fall of his senior year, when seniors participate in a stream of recruiting events by major corporations for hiring the following year. Doe was precluded from participating in recruiting through an erroneous status entry in Yale's career portal interface that prevented him from being informed of, or eligible for, on campus recruiting

events. This seriously damaged Doe's post Yale career plans, by making him ineligible for

the vast majority of lucrative post graduation career options available to Yale students. By

the time Doe wrote to Yale in mid September 2014, just a few weeks into the semester,

asking about on campus recruiting information, the time for participating in the process

had already passed. Upon graduating, Doe did not have a well paying job lined up, and as a

result sustained monetary damages.

## YALE'S GENDER DISCRIMINATION AT SAE

128.   A publicized UWC investigation of the SAE fraternity at Yale, that occurred at

around the same time as the UWC's investigation into Doe, provides another example of

Yale's systematic gender bias against males, in a decision that parallels the decision making

prejudices against Doe. Just six weeks after Doe's hearing before the UWC, the UWC held a

hearing against the leadership of the SAE fraternity at Yale, finding three leaders

responsible for creating a hostile environment on campus for the complainant in that case,

Zoe (a pseudonym), a female, and punished the respondents with probation, and banned

the fraternity from campus.

129.   According to the Yale Daily News[19]

Zoe's relationships with the five SAE brothers described in the speech occurred
from September 2013 to the following February. Her involvement with two of the
men lasted from September to December, and the other three occurred in
quick succession in January. She described these encounters as "consensual, casual
relations."

---

[19] http://features.yaledailynews.com/blog/2015/04/16/harassment-at-sae-and-its-fallout/

Following her involvement with the men, Zoe commented on some of their sexual performances in conversation with the fraternity president, a junior at the time. He was one of the five fraternity brothers with whom she had sexual relations, but she had come to regard him as a friend. Zoe said she felt they had come to trust each other. As they were both sharing details about their sex lives over the course of multiple conversations, Zoe told him that one brother climaxed quickly, another was enthusiastic about giving oral sex and a third enjoyed cuddling. He later passed along those comments to the group of the other four brothers, according to the University-Wide Committee on Sexual Misconduct panel's report.

Zoe's comments spread "like wildfire," one of the chaplains later told an independent factfinder assigned to investigate the incident. "She had provided intimate and private details about these encounters to others," he wrote in a statement to the UWC last April. "Our encounters had become public knowledge to many in the Yale community." Embarrassed that multiple peers had teased them about their sexual performances, the chaplains decided to address the comments publicly. Their roast became their platform.

Inside the fraternity house, the chaplains spoke in mock Spanish and Arabic accents, introducing Zoe as someone who had engaged in sexual relations with five members of the fraternity. The names of those members were listed, followed by description of their sexual performances based on the comments allegedly made by Zoe. Some of the comments mentioned in the speech were fabricated, according to Zoe, including remarks about the pubic hair of one brother.

130.   The panel found that, "in making this speech –redacted—and—redacted—

may not have intended to create a hostile environment for—redacted--...the panel does

find by a preponderance of the evidence that—redacted—speech and its performance

before the entire fraternity during its formal initiation ceremony constituted severe and

pervasive conduct that was objectively offensive and that such conduct had the effect of

interfering with and limiting -–redacted—ability to participate fully in her academic and

living environment.

131.   Yale punished the leaders of the fraternity for, without mens rea, creating a

hostile environment for Zoe. In that case, Zoe initially embarrassed the men by spreading

embarrassing details about their sex lives to their friends, these rumors than "spread like wildfire," and the men were embarrassed enough that they felt the best way to save their reputations would be to mock themselves in a skit before their brothers. Yet, Zoe claimed that it was she that was publically shamed and suffered from a hostile environment, not the brothers who she initially spread embarrassing sexual rumors about and who then used the spotlight to salvage their reputations through self deprecation. Zoe spread the rumors that went public, the victims of her shaming self deprecate in a skit to salvage the harm Zoe inflicted on their reputations, but yet Yale found that it was Zoe who suffered harm, not the brothers. Yale's finding of culpability against the fraternity brothers, and not against Zoe, is another example where Yale sees agency and responsibility in men, but no fault, agency or responsibility for the woman, even when the woman initiates the hostile environment that the men are responding to and trying to diminish, and/or when the woman commits acts of similar gravity to the men.

### FIRST CAUSE OF ACTION
### 20 U.S.C. § 1681 *et seq.*
### TITLE IX OF THE EDUCATION AMENDMENTS OF 1972
### (Erroneous Outcome)

132.    The Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

133.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

57

134.    Upon information and belief, defendants receive federal financial assistance for research and development.

135.    Plaintiff's gender is protected by Title IX.

136.    An intentional and motivating factor for Yale's imposition of this penalty was Plaintiff's gender.

137.    Defendants engaged in gender stereotyping to determine facts, contrary to the undisputed fact patterns of the case, to find Doe responsible and not find Roe responsible.

138.    Based upon the forgoing, as a direct and proximate result of the Defendants' conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of capacity for the enjoyment of life.

139.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of liquidated and punitive damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

## SECOND CAUSE OF ACTION
## 20 U.S.C. § 1681 *et seq.* TITLE IX OF THE EDUCATION AMENDMENTS OF 1972
## (Selective Enforcement)

140.    The Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

141.    Defendants exhibited patterns of decision-making that tend to show the influence of discrimination against the male Plaintiff that affected the Disciplinary Action.

142.    Defendants exhibited anti-male bias during the disciplinary action by the differential treatment he and Jane received in that, among other things, Jane's inconsistent testimony material to the claims relevant to the Disciplinary Action were either downplayed, justified and/or otherwise excused by defendants whereas John's credibility was challenged and deemed suspect.

143.    Defendants refused to discipline Jane despite her undisputed IPV conduct, and chose to discipline John, despite defendant's guidelines outlining that under such conditions John's actions should be seen as necessary for self preservation.

144.    Defendants chose to focus on whether Doe received consent, and not on whether Roe received consent, despite her being the one in control of the situation and despite her climbing on top of Doe.

145.    Defendants exhibited anti-male bias during the disciplinary action by the differential treatment he and Jane received.

146.    Defendants further exhibited anti-male bias during the disciplinary action by the additional differential treatment he and Roe received as set forth herein.

147.    Based upon the forgoing, as a direct and proximate result of the Defendants' conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and

consequential damages and has suffered damages including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of capacity for the enjoyment of life.

148.     By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of liquidated and punitive damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

**THIRD CAUSE OF ACTION**
**BREACH OF CONTRACT**

149.     The Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

150.     At all times relevant hereto, a contractual relationship existed between defendants and John pursuant to Defendant's policies and procedures.

151.     Defendants are required to act in accordance with these Policies in adjudicating reports of alleged violations of student conduct standards.

152.     For all the reasons set forth above, defendants materially breached its contracts with John by failing to comply with its obligations, standards, policies, and procedures set forth in the Policies in the course of the Disciplinary Action against John, and by subjecting him to a blatantly arbitrary and capricious disciplinary proceeding.

153.     Based upon the forgoing, as a direct and proximate result of the Defendants' conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and

consequential damages and has suffered damages including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of capacity for the enjoyment of life.

154.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of liquidated and punitive damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

## FOURTH CAUSE OF ACTION
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

155.    The Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

156.    Based on the foregoing facts, Defendants violated the covenant of good faith and fair dealing implied in its contracts with John by subjecting him to an unfair, arbitrary and capricious Disciplinary Action, and denying him the fruits of his contracts with Defendants.

157.    Based upon the forgoing, as a direct and proximate result of the Defendants' conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of capacity for the enjoyment of life.

158.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of liquidated and punitive damages, prejudgment

interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

## FIFTH CAUSE OF ACTION
## ESTOPPEL AND RELIANCE

159.    The Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

160.    Defendants' various standards, policies and procedures constitute representations and promises that Defendants expected or should have reasonably expected would induce action or forbearance by John.

161.    Defendants expected or should have expected John to accept Yale's offer of admission, incur expenses, and choose not to attend other colleges based on its express and implied promises, including that Yale would provide John with a fair, impartial and thorough process in the event he was accused of a sexual misconduct violation.

162.    John relied to his detriment on defendants' express and implied promises and representations.

163.    Based upon the forgoing, as a direct and proximate result of the Defendants' conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of capacity for the enjoyment of life.

164.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of liquidated and punitive damages, prejudgment

interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

### SIXTH CAUSE OF ACTION
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

165.    The Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

166.    When Defendants undertake to investigate allegations of sexual and other misconduct against one of its students, it owes that student a duty to protect him from foreseeable harm.

167.    By participating in the Disciplinary Action, John reasonably relied upon defendants' duty to protect him from harm.

168.    For all the reasons above, Defendants breached their duties of reasonable care.

169.    As a result, John has suffered physical harm, including severe emotional distress.

170.    A reasonable person would have suffered severe emotional distress under the same or similar circumstances.

171.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

### SEVENTH CAUSE OF ACTION
### NEGLIGENT SUPERVISION

172.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

173.    The Defendants' investigation and all related conduct occurred under Defendants' authority and with Defendants' specific knowledge.  The Final Decision Maker's decision and all related conduct also occurred under Defendants' authority and with Defendants' specific knowledge.  The Appeal Decision Maker's decision and all related conduct also occurred under Defendants' authority and with Defendants' specific knowledge.

174.    Defendants failed to adequately supervise the UWC, the Final Decision Maker, and the Appeal Decision Maker sufficiently to provide Plaintiff with a fair and impartial adjudication in accord with Defendants' policies and with applicable law.

175.    Defendants failed to adequately supervise the UWC, the Final Decision Maker and the Appeal Decision Maker sufficiently to provide Plaintiff with a non-discriminatory adjudication in accord with Defendants' policies and with applicable law.

176.    Based upon the forgoing, as a direct and proximate result of the Defendants' conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of capacity for the enjoyment of life.

177.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of liquidated and punitive damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

## EIGTH CAUSE OF ACTION
## PERMANENT INJUNCTIVE RELIEF

178.    The Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

179.    Defendants have violated its contractual obligations and state law.

180.    John's educational and career opportunities have been severely damaged. Without appropriate redress, Defendants will continue to label John as a sexual offender, greatly jeopardizing his prospects in government and public sector employment, as well as private employment, with no end in sight.

181.    John is entitled to redress that will make him whole and requests that this Court issue a permanent injunction: (a) reversing the findings and sanction against John made by Defendants pursuant to the Disciplinary Action, the Investigative Report, the Review Panel Decision and the Appeal Panel Decision; (b) ordering Defendants to expunge John's disciplinary record and remove it from his education record; and (c) ordering REDACTED to provide John with certification that shall be made available to third parties (such as prospective and current employers) certifying that the findings and sanction have been reversed and expunged from John's education record.

### Prayer for Relief

182.    **WHEREFORE,** Plaintiff John Doe, respectfully requests the Court: a. Order defendants to reverse and expunge its findings of responsibility and sanction from John's education record, b. Order defendants to verify this reversal and expungement of John's education record by providing John with certification to third parties that the findings and sanction have been reversed and expunged from John's education record; c. Award John compensatory damages in in an amount to be determined at trial, including, without

limitation, damages to physical well-being, emotional and psychological damages, damages

to reputation, past and future economic losses, loss of educational and professional

opportunities, loss of future career prospects, and other direct and consequential damages;

d. Award prejudgment interest; e. Award attorneys' fees and costs pursuant to statutory or

common law doctrines providing for such award; and f. Grant such other and further relief

that the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated: August 12, 2016

/s/ John Doe

c/o The Kaplan Law Office
30 Wall St, 8th Flr
NY, NY, 10005