UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOHN DOE,
    Plaintiff        No:  3:16cv1380(AWT)


vs.


YALE UNIVERSITY


    Defendant      July 3, 2017
--------------------------------------------------------x

## SECOND AMENDED COMPLAINT AND JURY DEMAND

   Plaintiff, John Doe, by his attorneys, The Kaplan Law Office, as and for his Amended Complaint against Yale University (Yale or Defendant), and respectfully alleges as follows:

### SUMMARY OF THE CASE

   1.   On or about April 4, 2014 Jane Doe, a classmate of Plaintiff John Doe at Defendant Yale University, filed a complaint against John alleging that John used his physical strength to force her to have sexual intercourse with him without her consent.  She said that he verbally abused her, and that he was aggressive and forcefully restrained her.  She was terrified.

   2.   Jane filed this complaint at Yale because Yale provides a student who complains of forcible sexual intercourse without consent such services as an investigation of her complaint and a hearing before a trained panel.  Yale also punishes the student responsible for this misconduct, and a student accused of forcible sexual intercourse without consent, like John, could be suspended or expelled.

   3.   Yale also provides interim punishments, like a no contact order, until the accused student's final punishment is declared.

1

4.      Despite Jane's allegations in her complaint, Jane recanted her allegations of force, non-consent, and terror when she declared during her hearing, "I could have left, and I just didn't. I don't know why. I could have left, but I wanted him to be nice to me so I got into his bed."

5.      Yale found John responsible anyway and put him on permanent probation until he graduated a year later, thus permanently marring his academic record, damaging his reputation and limiting his opportunities and prospects.

6.      This case also arises out of Yale's discrimination against John in violation of Title IX for erroneously, arbitrarily and capriciously punishing John for having sex with a female student who willingly and without force unambiguously  "got into his bed" to engage in sex with him.

7.      This case also arises out of Yale's discrimination against John in violation of Title IX for erroneously, arbitrarily and capriciously bringing a second complaint against John on behalf of Sally Roe, another student who alleged John forcibly touched and restrained her without her consent.

8.      Sally's story like Jane's also was unfounded, yet Yale pursued Sally's informal complaint as a formal complaint which could have led to John's suspension or expulsion anyway even though Sally did not want to file a formal complaint and did not appear at the hearing.

9.      Indeed, Yale willfully, knowingly and maliciously prosecuted its own claim against John because Yale saw a pattern between Sally's allegation and Jane's allegation, though Jane recanted her allegation, thus nullifying any pattern between the two in violation of Title IX.

10.     Moreover, this case arises out of a primary discriminatory incident preceding both Jane and Sally's complaints in which Yale restricted John from having contact with the female

2

Teaching Assistant in his philosophy class. The TA reported John to Yale upon receiving academic papers from John in which he referenced (and denounced) the crime of rape and rapists to illustrate Plato's ideas of justice in the *Republic*. John was also required to take sensitivity training, and from that time forward, John was a person of interest to Yale's sexual misconduct apparatus.

11.     This case alleges a continuing violation pursuant to Title IX for severe and pervasive discrimination, harassment, hostile environment (it was suggested by a female staff member that John be castrated), and retaliation; and breaches of Yale's contracts, policies and procedures including Yale's precious and iconic principles of academic freedom.

12.     As a result John was the subject of two informal and two formal complaint procedures. He racked up three no-contact orders and one probation, had been accused of being a rapist twice and a potential murderer; had been informed that a Yale staff member advocated that John should be castrated; was cut off from his primary extra-curricular activities; was blocked from participating in Yale's Senior Recruiting at their Center for Career Strategy, and was not allowed free access to graduation ceremonies and activities in spring 2015 when he graduated.

13.     Defendant harassed and discriminated against John for being male, marred his record and reputation forever as a serial sexual offender without any explanation of the actual conduct involved thus interfering forever with his admission to graduate school or obtaining employment causing him, among other things, severe emotional distress, loss of quality of life, damage to his reputation, financial loss, and loss of opportunity and prospects.

**THE PARTIES**

14.     John, is a natural person, citizen of the United States, and resident of the State of New York.

15.     During the events described herein, John was a student at Yale and resided in New Haven, Connecticut.

16.     Defendant Yale University is a private university in New Haven, Connecticut.


## JURISDICTION AND VENUE

17.     Venue is proper under 28 U.S.C. §1391(b)(1)(2).

18.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 because the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

## STATEMENT OF FACTS

19.      John entered Yale in the Fall of 2011 and graduated in Spring 2015 (the "Relevant Time Period"). He arrived at a time of great change within the university with respect to Title IX and issues of sexual assault.

20.     In March 2011, 16 female students and alumna brought a complaint to OCR alleging that Yale's failure to respond "in a prompt and equitable manner" to a fraternity's crude chants created a hostile environment for female students on campus.

21.     The students' and alumna's complaint to OCR further alleged an "ongoing pattern" of sexual harassment, and identified the Defendant's grievance processes for handling complaints of sexual misconduct as inadequate.

22.     OCR wields the power to penalize institutions found not to be in compliance with its directives with a loss of federal funding. In 2014-2015, the federal government funded $507.1 million, or 75.3% of Yale's 2015 grant and contract income, in support of Yale's research and training programs.[1]

23.     The OCR launched an extensive and thorough investigation of Yale's practices. The government coerced Yale into a major overhaul of Yale's internal grievance procedures and apparatus regarding sexual misconduct pursuant to the OCR's resolution letter on or about June 15, 2012 (the "Resolution Letter"). On information and belief, Yale paid a fine to the OCR in connection with the OCR's and was subject to a monitoring agreement.

**Governing Rules and Documents**

24.     Prior to the Resolution Letter, the premiere document governing Yale's handling of accusations pursuant to Title IX was a prior directive from the OCR known as the "Dear Colleague Letter" dated April 4, 2011, which provided instructions on how to comply with Title IX when investigating and resolving complaints of sexual misconduct. ("2011 Dear Colleague Letter") (available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html accessed 9/26/16).

25.     The Dear Colleague Letter primarily identifies females as complainants or victims. To illustrate its bias toward female complainants, the Letter, among other things warns education institutions that they must "never" view the "victim at fault" for sexual violence particularly if drugs or alcohol was involved.

26.     The Dear Colleague Letter provides no such amnesty to students accused of sexual misconduct, who are almost entirely male.

---

[1] http://finance.yale.edu/sites/default/files/20142015%20Annual%20Financial%20Report_0.pdf

27.     With regard to procedures, the Dear Colleague Letter mandates that "public and state-supported schools must provide due process to the alleged perpetrator."

28.     However, with regard to private schools such as Yale, the Dear Colleague Letter makes the need for due process a nullity for the accused to the extent such process may impose on the complainant's rights pursuant to the Dear Colleague Letter:  "[S]chools should ensure that steps taken to accord due process rights to the alleged perpetrator *do not restrict or unnecessarily delay the Title IX protections for the complainant [emphasis added]*."

29.     Whereas to a complainant, often regarded as a victim or survivor of sexual assault, any right to the accused would be a burden, the Letter's premier mandate therefore gutted if not eliminated any trace of constitutional rights/ due process rights for the accused.

30.     Among the complainant's rights is that sexual misconduct grievances must be considered pursuant to the preponderance of the evidence standard which is the lowest burden of proof— commonly known as the 50.1% or "more likely than not" standard. This directive is custom made for female complainants as it is intended to accommodate the common predicament in cases involving sexual assault that there is no material evidence beyond the representations of the parties.

31.     Without due process rights for the accused that would allow him to weigh the complainant's credibility or the credibility of her witnesses and evidence, the right to an attorney, and a clear burden of proof on the complainant, among other things, the preponderance of the evidence standard leads to more findings in favor of the complainant and against the accused. At Yale, since 2011, 80% of respondents were found responsible, according to UWC Chair David Post.

32.     Indeed, having removed constitutionally protected rights for the accused, the OCR's partisan advocacy for the predominately female accusers, and by extension Yale's, has reduced any burden on the complainant to plead specific allegations against the accused, be present at a hearing or be cross examined.

33.     The loss of constitutional due process protections for John was the loss of representation by an attorney in the Jane matter (John had the right to an attorney in the Sally matter) even though the allegations against John constituted a felony, notice of a complaint that has specific allegations that constitute a violation of Yale's sexual misconduct policies, cross examination of witnesses, and direct review of primary witness testimony and evidence, a clear burden of proof on the complainant, and a right to defenses and counter claims for the accused.

34.     The OCR's Resolution Letter amplified the Dear Colleagues Letter's constitutional and due process shortcomings and the OCR's mandates set forth in its Resolution Letter became Yale's procedures (the "OCR Mandates") which became the foundation for Yale's University-Wide Committee on Sexual Misconduct Procedures (the "UWC Procedures").

35.     The rights the OCR and by extension, Yale, grants to the complainant in the service of a "prompt and equitable resolution" of the complaint include as follows: reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; designated and reasonably prompt timeframes for the major stages of the complaint process; written notice to the parties of the outcome of the complaint and any appeal; and an assurance that [Yale] will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate."

36.     While the OCR Mandates allow that "both parties must have equal opportunity to present relevant witnesses and other evidence," only the complainant has the right to adequate,

reliable, and impartial investigation of her complaint while the accused has no rights to affirmative defenses or counter claims.

37.     Further, the Resolution Letter grants only the complainant, but not the accused rights pending the outcome of the complaint as follows: "Pending the outcome of an investigation, Title IX requires [Yale] to take steps to protect the complainant from further harassment as necessary, including taking interim steps before the final outcome of the investigation. [Yale] should undertake these steps promptly once it has notice of a sexual harassment allegation. It should notify the complainant of his or her options to avoid contact with the alleged perpetrator and allow students to change academic or living situations as appropriate. For instance, [Yale] may prohibit the alleged perpetrator from having contact with the complainant pending the results of the investigation. When taking steps to separate the complainant and the alleged perpetrator, [Yale] should minimize the burden on the complainant and thus should not, as a matter of course, remove the complainant from classes or housing while allowing the alleged perpetrator to remain. In addition, recipients should ensure that complainants are aware of their Title IX rights and any available resources, such as counseling services, and their right to file with local law enforcement.

38.     The aforementioned interim practices to protect the complainant often lead to losses of liberty and property to the accused student such as being removed from classes or his residence. Yet, these interim measures do not provide for the accused's rights before enduring a loss to his liberty or property.

39.     Indeed, the OCR Mandates and Yale's UWC Procedures do not afford the accused a right to allege affirmative defenses, file counter claims, inspect evidence, cross

examine witnesses, protection from harassment and discrimination, adequate, reliable, and impartial investigators and advisors, and "available resources" such as counseling services.

40.     Also, the OCR Mandates and UWC Procedures further permit "voluntary informal mechanisms . . .  for resolving some types of sexual harassment complaints," a process completely devoid of any protections or rights to the accused.

41.     In accord with the OCR, Yale's "voluntary informal mechanisms," a/k/a the informal complaint process is in the first instance by no means "voluntary" for the accused.

42.     Yale imposes two types of punishments within the informal complaint process: a) the no-contact order which restrains the accused's access to campus; and b) counseling or sensitivity training.

43.     There is a third consequence on the accused as well:  the stigma and damage to reputation of having been accused of and punished for an allegation involving sexual misconduct or harassment.

44.     And a fourth:  having been the subject of a complaint, the accused is a person of interest to the UWC, and may become subject to repeated complaints and retaliatory acts, as John experienced.

45.     The informal complaint process is an expedited and summary judgment procedure in favor of the complainant who has no burden to prove her complaint and retains the option to pursue a formal complaint and pursue greater punishments even though the accused has already been summarily punished in the informal process.

46.     Moreover, the informal complaint process provides no standard for initiating a complaint that alleges specific violations of the UWC's sexual misconduct policies. Instead, the accuser's subjective anxiety or suspicion is a valid basis and the informal complaint can proceed

so long as the accuser is merely concerned that the accused may at some point commit sexual misconduct.

47.     John endured two such informal complaints, and as will be alleged in more detail herein, the informal process by-passes impartiality, investigation and such fundamental practices as presumption of innocence or burden of proof while the accused remains under threat that the accuser-- or Yale itself-- may at any time make a formal complaint against him, a consequence that John also suffered and will also be alleged in more detail herein.

48.     The tally of rights and privileges granted the accuser pales against the one platinum right that seems to supersede all others in favor of the complainant:  immunity to the complainant should her allegations be unfounded, false, or recanted even if the complainant knew her claims were false and willfully alleged them or breached the UWC's confidentiality terms to share her accusations with Yale's general community.

49.     The UWC has strict terms regarding honesty and confidentiality which in relevant part is as follows: "The UWC and all members of the Yale community who are involved in a matter before the UWC are expected to maintain the confidentiality of its proceedings and the information obtained for those proceedings . . . . Parties and witnesses are expected to cooperate in the investigation of matters brought to the UWC.  Parties and witnesses must provide truthful information in all phases of a UWC proceeding. Failure to provide truthful information or any attempt to impede the UWC process may result in a recommendation for a more severe penalty or a referral for discipline."

50.     On information and belief, but also from a review of the Spangler Reports (defined below) from 2011-2015 where gender is recorded, Defendant has never disciplined a

female student for making false allegations in a UWC proceeding or for breaching Defendant's rules governing confidentiality.

51.    Of course, all issues regarding the accused's credibility are used against the accused student and he is vulnerable to further disciplinary actions should his testimony and/or evidence be proven false or even doubted.

52.    Because of the OCR Mandates and Yale's compliance thereto, students at Yale who are accused of sexual misconduct do not have the same constitutional rights as similarly situated students at public schools, or any similarly accused person accused of forcible sex without consent.

53.    Further, the OCR imposed a particularly coercive tactic on Yale to supervise Yale and to ensure it was prosecuting sexual misconduct cases and punishing accused students in compliance with the one-sided rigor the OCR requires and with the numbers to prove it:  The Spangler Reports, eponymously named after Deputy Provost Spangler, are semi-annual tallies of sexual misconduct complaints, their procedural status, and a tally of punishments.

54.    No other school during the Relevant Time Period had been subject to report instances of sexual misconduct as frequently, publicly and thoroughly as OCR required Yale to do in the Spangler Reports that are in addition to any other reporting obligation Yale is subject to as a matter of law.

55.    The Spangler Reports are also an apologia on the state of sexual misconduct on campus and how much more Yale must do despite the ever increasing numbers of complaints and students punished and ever expanding initiatives to support the victims of sexual misconduct.

56.     Pursuant to the Spangler Reports, during the four year period when gender was listed, Yale has always proceeded with a complaint of sexual misconduct or harassment filed by a female complainant and has never proceeded with a complaint of sexual misconduct or harassment filed by a male complainant. Further, Yale has only disciplined males for misrepresenting facts, never a female.

57.     As will be alleged in more detail herein, John attempted to file a complaint based on intimate partner violence (IPV) perpetrated by Jane, and against Sally for misrepresentations to the UWC, but Yale refused to prosecute his complaints.

**John**

58.     John was a [REDACTED] and a member of Yale's [REDACTED], which is a program for individuals [REDACTED]**.**

59.     John, like the other [REDACTED] students, was not invited to and did not participate in Yale's incoming freshman orientation program that included instruction on Title IX, the UWC, which had just recently been formed, and instruction and introduction to other related programs at Yale, like Yale's center for Sexual Harassment and Assault Response and Education, known as SHARE.

60.     Such orientation was crucial to understand Yale's idiosyncratic affirmative consent definition that had not yet been adopted by the Connecticut legislature during the Relevant Time Period that in relevant part is as follows: "Sexual activity requires consent, which is defined as positive, unambiguous, and voluntary agreement to engage in specific sexual activity throughout a sexual encounter. Consent cannot be inferred from the absence of a 'no'; a clear 'yes,' verbal or otherwise, is necessary.  Consent to some sexual acts does not constitute

consent to others, nor does past consent to a given act constitute present or future consent.

Consent must be ongoing throughout a sexual encounter and can be revoked at any time.

Consent cannot be obtained by threat, coercion, or force. Agreement under such circumstances

does not constitute consent."

61.     Unlike the populist "no means no" standard for consent, Yale's consent standard

requires an understanding of what range of behaviors constitute "positive, unambiguous, and

voluntary agreement, " or what kind of behaviors constitute a "clear 'yes'" other than a verbal

"yes."

62.     Indeed, the standard was so unclear, Yale supplemented its consent standard in

2013 with scenarios that attempted to clarify some of these vague terms.

63.     Moreover, John was not only [REDACTED] than his fellow classmates and a

member of a program that in some ways isolated him from mainstream student programs and

activities, John's personal life experience further isolated him from mainstream student culture at

Yale.

64.     Until John's matriculation at Yale, he had been raised and solely educated inside

[REDACTED].

65.     Among other things, John adhered to his community's rules [REDACTED].

66.     Once at Yale, John social activities primarily centered around the Center

[REDACTED]  (the "Center"), which offers among other things religious-text based classes,

study groups, Yale's only [REDACTED] facility, and social activities, and is operated by Yale's

Chaplain's Office.

67.     John's religious education and training was extensive. He was [REDACTED]

trained and he had exceptional expertise in primary [REDACTED]  liturgical texts and was

13

fluent in the primary languages in which they were written.  As such, John was an active and leading member of the [REDACTED] students community at the Center.

68.     The  Center was being administered by [FEMALE CHAPLAIN A] and [FEMALE CHAPLAIN B] (the "Female Chaplains"), who were affiliated with the more progressive strains of [REDACTED]  that embraced feminism and other social justice policies.

69.     Also part of the [REDACTED] administration was [MALE CHAPLAIN 2], and [MALE CHAPLAIN 1], who was identified with the more [REDACTED] strains of [REDACTED]  that constituted the male-dominated "patriarchal" branch of [REDACTED] practice and history.

70.     The Female Chaplains overtly and conscientiously denounced [REDACTED] patriarchy and by implication, [REDACTED].  John, who was the only male student of [REDACTED] origin at Yale for most of his time there, was identified with the male-centered patriarchal and [REDACTED] the Female Chaplains opposed.  Jane's  allegations against John confirmed the Female Chaplain's worst  suspicions.

71.     Such hostility against male, [REDACTED] men contributed to [MALE CHAPLAIN 1]'s decision to leave Yale.

72.      Nevertheless, the Center had become the foundation if not the center of John's social life, before [FEMALE CHAPLAIN B] took over its leadership, and his closest friends while at Yale included [REDACTED] students he met through the Center and who primarily resided at [REDACTED]  College.

**Wrongful Censorship of Academic Expression**

73.     Pamela Schirmeister, Defendant's Title IX Coordinator requested an "informational meeting" with John on or about December 5, 2013 "regarding a paper he submitted in class."

74.     John asked [FEMALE CHAPLAIN A] to accompany him to the meeting.

75.     [FEMALE CHAPLAIN A] was the [REDACTED] students' go-to Chaplain for inquiries, counseling and support regarding Title IX and sexual (mis)conduct on campus and on information and belief, [FEMALE CHAPLAIN A] readily provided such counseling and support to female students.

76.     However, [FEMALE CHAPLAIN A] refused to appear with John at the meeting, and suggested that he take an alternative chaplain to advise and accompany him.

77.     Thereafter and upon John's request, [MALE CHAPLAIN 2], a retired male member of the Chaplain's Office, accompanied John.

78.     At the meeting, Schirmeister informed John that the purpose of the meeting was to discuss an illustrative point he argued in an academic paper he submitted to his Teaching Assistant in his [REDACTED] class, a female, who had been his breakout group instructor, paper reviewer, and grader the whole semester (the "TA") as well as an oral statement John made as part of a related academic argument all of which were of concern to Defendant.

79.     John was a [REDACTED] major and had submitted an academic paper to his TA in compliance with and satisfaction of an assignment to critique Book IV, 435c-441c of Plato's *Republic* regarding justice and how it integrates with matters of the soul. John critiqued Plato's argument for the tripartite nature of the human soul, where Plato argues that the soul has three parts: the rational, the spirited (desire for power), and the appetitive (lust) that can be in conflict when directed at the same object.

15

80.     On point, John in relevant part argued,

"I believe spirit can be allied with appetite against reason. Take any drunken-fest. People drink spiritedly even when they know it is against their greater good. Even if an argument will be presented in that case that people's reason is impaired at the time they drink, and thus not in conflict with their spirit, consider the case of a rapist. A rapist may rape with much vigor, or with anger. Here, presumably, reason should dictate not to rape. However, the person rapes with passion. Is spirit not allied with appetite against reason in this case?"

81.     Later in the paper, John developed his argument denouncing "rape" and the

"rapist" as follows:

It is possible, however, that when Plato dismisses the non-noble soul, Plato is doing this because he believes that in the non-noble soul, also, there is no conflict between spirit and intellect. Perhaps he believes that the non-noble person's intellect does not tell him that justice should reign supreme. Thus, to Plato, the non-noble person, also, does not have a conflict between spirit and intellect. Perhaps, then, similarly, Plato might believe that in the case of the rapist, the rapist would be considered in a similar vein to the non-noble person. The rapist lacks the reasoning to tell him that his spirit is misaligned. Thus in the rapist, too, spirit and reason are not in conflict.  This counterargument, though, is weak. It is improbable that it would be the case that rapists are universally not in touch with a reason telling them that their conduct is counter to reason.

82.     In a second paper John submitted to the TA, Doe critiqued Plato's *Republic* (Book

IX, 580d-583b), where Plato argues that philosophers, who correspond to the human intellect,

are better arbiters of the good life than the victory and profit lovers, who correspond to the

spirited and appetitive components of the soul, and as such philosophers should rule the polis.

John, in his paper, stated in relevant part:

The victory/profit lover has several possible replies to the philosopher. They can say, simply, that the claim that philosophers have experienced all three of the basic pleasures is false. Many philosophers have simply never experienced the full impact of the spirited or appetitive pleasures. Have philosophers necessarily experienced the full pleasure of a sexual or love relationship? Or have they experienced the pleasures massive wealth can bring?

83. When discussing this line of reasoning with his TA in preparation for writing his paper, John made the following statements in the style of a Socratic inquiry and in relevant part during an academic exchange with the TA as follows:

84. John first established that Yale's philosophy faculty "are among the world's most acclaimed masters of philosophy."

85. Then John rhetorically queried, "Is Yale's philosophy faculty most qualified in today's society to opine on matters of sex?" an established element of the appetitive component of "the good life."

86. Finally, to counter Plato's argument and prove his point that philosophers are not the best arbiters of the good life, John concluded, "The philosophy faculty is probably least likely among the population to know how to get laid."

87. At the meeting, Schirmeister explained that she had called John in to discuss the paper he submitted in which he discussed rape. Schirmeister complained that John's choice to employ "rape" to illustrate and support his inquiry in his assigned academic papers made him a person of interest to Defendant that necessitated intervention to ensure that John was not a perpetrator himself (an inference that may not have been considered had John referred to a more anodyne crime, like murder, which is the example Plato offers to support his argument).

88. Schirmeister explained that she had been teaching English for twenty plus years, and with that experience knows that an example that is unnecessarily provocative serves to distract the reader from the author's argument (thus explaining the stultifying dullness of academic papers).

89. Schirmeister ordered that John attend "sensitivity training" at the mental health center.

90.     Schirmeister also restricted John from interacting with his assigned TA, who as his breakout group instructor, paper reviewer, and grader the whole semester, was the only instructor he had any personal contact with throughout the semester, and thereby put his participation and academic record in that class and other classes in jeopardy as a result of the emotional distress and stress this episode created.

91.     Schirmeister memorialized the incident in the *Yale University Title IX Incident Summary Form* (the "Form"). The Form has in its entirety the following account of the complaint against John: [TA], who serves in TF [Harte's] course, reported to Harte that [John Doe] had turned in a paper in which he used rape as an example of something, in such a way that [TA] found it peculiar. The example was not inappropriate in itself, but nevertheless alarmed her. She noted that [John Doe] has been somewhat disrespectful most of the term, and that once during office hours he remarked that he thought no faculty in the Philosophy department had good sex. This remark seemed inappropriate to her and made her uncomfortable.

92.     Based on the aforementioned complete summary of the incident, the Form identified the allegation that best categorized John's behavior based on the complainant's description of the events as solely being "Sexual Harassment (e.g, inappropriate communication, unwanted sexual advances, threatening, intimidation)."

93.     After an investigation, which was described in total in the Form as being, "I [Schirmeister] talked with Harte and corresponded with [TA]. I then met with [John Doe] who was accompanied by [Advisor]," Schirmeister's findings and conclusions in their entirety were that "John Doe has an unsettling affect. [Redacted] and gives the impression that he does not easily understand social cues. In any case, he admitted to the remark and apologized for it. The example in his paper is not well taken, but it is not irrelevant to the matter at hand either. During

our meeting, [John Doe] said he wished that when I first contacted him I had told him precisely what the meeting was about. As a matter of policy, I have not been doing this because I don't want to alarm students, but I am taking it under consideration."

94.     Having acknowledged that **Schirmeister** did not provide John with notice of the allegations prior to the meeting, **Schirmeister** concluded the report with the action taken in its entirety as follows:  "I [**Schirmeister**] advised [John Doe] to talk with John Criscuolo at the SHARE Center because I thought he might be able to help [John Doe] understand how his remarks and behaviors are perceived by other people. I also talked with him at length about the proper use of examples in philosophical papers to try to indicate to him why [TA] found [John Doe]'s paper so unsettling. Lastly, we agreed that [the Teaching Fellow] would grade any remaining assignments, and that if [John Doe] has questions related to the course, he should go to [Harte] rather than to [TA]."

95.     This no-contact order was especially wrongful and deleterious in that it directly impeded John's education by censoring his academic papers made in pursuit of a good faith inquiry into an assigned topic, and prohibiting him from engaging with the Teaching Assistant, the only instructor he had any contact with throughout the semester, which had the chilling effect of discouraging him from exercising independent intellectual inquiries during the remainder of his time at Yale.

96.     On information and belief, no female student at Yale who had made an academic inquiry into "rape" or had incorporated into her thesis the crime of "rape" to illustrate and support an argument in an academic paper was ever prohibited from interacting with her instructor.

97.     On information and belief, no female student who had made academic inquiry into "rape" or had incorporated into her thesis the crime of "rape" to illustrate and support an argument in an academic paper ever led Defendant to infer that the female student was a potential rapist or in any way a threat.

98.     On information and belief, no female student who had made an academic inquiry into "rape" or had incorporated the crime of "rape" to illustrate and support an argument in and academic paper was told to participate in "sensitivity training."

99.     Schirmeister's actions violated John's right to participate in and benefit from Yale's policy on academic freedom that was cemented in the 1975 Woodward Report, and enshrined in the University's Undergraduate Regulations[2], which in relevant part sets forth the following rights, duties and obligations:

> the right to think the unthinkable, discuss the unmentionable, and challenge the unchallengeable…. Above all, every member of the university has an obligation to permit free expression in the university. No member has a right to prevent such expression. Every official of the university, moreover, has a special obligation to foster free expression and to ensure that it is not obstructed…. we believe that the positive obligation to protect and respect free expression shared by all members of the university should be enforced by appropriate formal sanctions…

100.     Yale's policy requiring unbridled freedom of academic expression remained unchanged during the relevant time period and was publicly endorsed in November 2015 when Yale University President Peter Salovey and Yale College Dean Jonathan Holloway issued a joint statement stating:

> We also affirm Yale's bedrock principle of the freedom to speak and be heard, without fear of intimidation, threats, or harm, and we renew our commitment to this freedom not as a special exception for unpopular or controversial ideas but for them especially… By preventing anyone from bringing ideas into the light of day, we deny a fundamental freedom -- and rob ourselves of the right to engage with those ideas in a way that gets to

---

[2] http://yalecollege.yale.edu/sites/default/files/files/URs%202015-2016(1).pdf

the core of Yale's educational mission. We make this expectation as a condition of belonging to or visiting our community[3].

101.    Yale's President explicitly conditioned belonging to Yale on the individual's affirmation of each community member's right to freedom of expression. The Woodward report specifically calls on Yale officials to ensure this freedom, which Defendant wrongfully violated.

102.    Further, the informal complaint procedure, the no-contact order and sensitivity training were arbitrary and capricious as John was not only _not_ in violation of any UWC or Yale rule, he was actually exercising and supporting Yale's mandate for academic freedom and was not and could not be a threat to the TA or any member of Defendant's community.

103.    A male professor in the philosophy faculty explained to John that the department was considered a bastion of male patriarchy and Yale took the TA's complaint seriously as a means to address that perception.

### John and Jane

104.    The UWC's policy for intimate partner violence (IPV) is as follows: "Intimate partner violence (IPV) occurs when a current or former intimate partner uses or threatens physical or sexual violence. IPV also may take the form of a pattern of behavior that seeks to establish power and control by causing fear of physical or sexual violence. Stalking may also constitute IPV."

105.    The UWC's policy for stalking (IPV) is as follows: "Stalking is repeated or obsessive unwanted attention directed toward an individual or group that is likely to cause alarm, fear, or substantial emotional distress. Stalking may take many forms, including following, lying

---

[3] http://news.yale.edu/2015/11/10/affirming-our-community-values-message-president-and-yale-college-dean

in wait, monitoring, and pursuing contact. Stalking may occur in person or through a medium of communication, such as letters, e-mail, text messages, or telephone calls. In some circumstances, two instances of such behavior may be sufficient to constitute stalking."

106.   John met Jane Doe in October 2013 through his social contacts at the Center.

107.   Jane was sexually experienced and on Jane's initiative, John began a mutually consensual sexual alliance with her.

108.   John and Jane's relationship was primarily for mutually consensual sex on the weekends throughout the Fall 2013 and into the Spring 2014 semester.

109.   John informed Jane of the informal complaint in connection with his philosophy class. As events unfolded between them, Jane used John's prior incident as a reason why she came forward to complain about John as he was a repeat offender.

110.   Jane continually and consensually stayed in the relationship and between October 2013 and March 2014 initiated a sexual meeting with John over 32 times as compared to John's interest to initiate a rendezvous only two times as evidenced by their text messages.

111.   Throughout their relationship, Jane demanded John's attention and would berate him if he did not respond to her in the manner she desired and blame John for her hurt feelings.

112.   Further, such interactions occurred during periods when John was studying or was otherwise under time pressure to meet academic requirements as evidenced in the following exchange during finals week of the Fall semester. Similar exchanges occurred numerous times throughout their relationship:

Jane:   12.12.13/21:14:      How goes the work?

John:   12.12.13/21:19:      Intense

Jane:   12.12.13/21:23:      What does that mean?

John:   12.12.13/21:33:       same

Jane:   12.12.13/21:34:       What's the exam time tomorrow

John:   12.12.13/21:35:       can't talk gotta work. Bible

Jane:   12.12.13/21:36:       I'm just trying to be nice . . .

Jane:   12.12.13/22:14:       OK look. I was just trying to express interest in how things are going for you and again I felt like you're being rude/cold to me for no reason. This doesn't even have anything to do with how much time you have or how busy you are. I don't know why you'd choose to address me like that.

John:   12/12/13/22:33:       Can we please stop this? I just really can't text. I meant no harm. I need to keep focus. You're being self destructive. I will not talk about this any further.

Jane:   12.12.13/22:40:       There's no "this"! The texts you just sent were unnecessarily rude, in response to me just trying to be sweet. Anyone would have a negative reaction to that, this is not me being "self destructive", and this is not some continuation of a previous issue. You're making way more of it than is there. I just deserve some more basic human politeness than the way you were just acting. People don't talk to me that way, and I'm sure they don't to you wither, so I don't understand why you would now. Again, treating me with basis respect/politeness isn't a time issue.

Jane:   12.12.13/22:55:       I know a lot of busy people right now, and no one else thinks that because they're busy it's okay to stop being nice to people. Do you seriously not get that you can maintain a polite tone without it taking any more of your time? You're the one being destructive here. I was just trying to be nice to you.

Jane:   12.12.13/23:46:       Why can't you just say sorry? I literally cannot understand why you'd rather act like a jerk to me because you're busy, it doesn't make any sense.

113.    Regardless of Jane's tone in the previous exchange, and the lack of resolution to her complaints, Jane nevertheless contacted John and had a sexual encounter with John on December 12, 2013 and tried to initiate yet another sexual encounter the following night as evidenced in the texts as follows:

Jane:   12.14.13/21:29:       Want to come over later?

John:   12.14.13/20:08:       Thanks for inviting me but I don't think I'll make it.

Jane:   12.14.13/20:16:       :( damn. Horny. But okay. Maybe tomorrow.

114.    During their relationship, a cycle emerged:  Jane and John would agree to the parameters of their relationship as being primarily sexual; Jane would initiate and schedule a sexual encounter and they would consensually consummate the sex at the encounter; then Jane would initiate a social exchange with John or request sex; Jane would be dissatisfied with John's response; Jane would berate John and/or blame him for making her feel bad about herself; Jane and John would review the parameters of their relationship; then Jane would initiate, schedule and consensually consummate a sexual encounter with John.

115.    Bookended with consensual sex, this pattern also followed an emotional cycle in which Jane expressed anger, tears, and accusations blaming John for her feelings of self doubt. John and Jane would meet for lengthy discussions about Jane's issues and feelings.

116.    After declining Jane's requests to have sex on December 14 and again on December 15, in the early morning of December 16, and again on the evening of December 17, and under pressure during finals period, John agreed to meet Jane's demands to talk if she promised the conversations would be short.

117.    However, as often as John tried to end the conversation and resume his studies, Jane, sometimes with tears, sometimes with shouted and arch demands, insisted that John not leave until the issues were resolved.

118.    Both conversations went on for hours.  At the end of the second talk, John told Jane their relationship was over.

**The January 2014 Incident**

119.    At the beginning of the spring semester in January 2014, John had more time on his hands and he reached out to Jane to apologize for his lack of time during the previous finals

24

period and offered to talk again through the issues this time while not under time pressures. He and Jane reconnected and Jane asked him for sex. John consented.

120.    On January 19, 2014, Jane asked John to meet her for sex.

121.    John declined and Jane sent John a series of angry texts and called John 10 times in the following hours that evening.

122.    On the following night of January 20-21, 2014 she called him eleven more times.

123.    On January 22, 2014 (the "January 2014 Incident"), John asked to meet Jane in her dorm room and told her he could no longer have sex with her.

124.    As John was leaving her room, Jane angrily, said, "you can't leave me like this" and forcibly grabbed John's arm and pulled him into her bedroom.

125.    John tried to escape, but Jane repeatedly and forcibly pulled him back into her room. Finally, in a fit of anger, Jane pulled John so forcefully, she twisted him around in the process and pushed him onto her bed. Pinning herself against him Jane screamed, "You cannot leave!" and "I'm trying to talk to you!"

126.    John spent over an hour against his will in her room until Jane calmed down and allowed him to leave.

127.    Soon thereafter John encountered Jane around campus. John was ambivalent about restarting his sexual relationship with Jane, but agreed, and they began having mutual consensual sex together.

128.    By February 9, 2014, the cycle of Jane's demands for sex, John's acquiescence, and Jane's demands that John "be nice to her" when he declined, played out once again, with Jane calling John eight times within the space of half an hour and sending John a series of angry texts after John declined her request to have sex with her.

25

129.    On March 6, 2014, the date of the incident Jane complained of, Jane contacted John after 1:00 am and asked whether she could come over. It was understood between John and Jane that her request to visit John in his apartment was a request to have a sexual encounter.

130.    The sex between Jane and John throughout their relationship centered on Jane's expressed wish to be sexually submissive. To this end, Jane expressly requested that John incorporate "dirty talk" such as name-calling as well as sexual positions that were intended to make Jane feel submissive and/or humiliated.

131.    John, who had no sexual experience at all prior to meeting Jane, was unfamiliar and uncomfortable with Jane preferences, but under Jane's tutelage, he learned the specific language and acts that Jane desired and experienced in prior relationships.

132.    As the relationship and John's facility with submissive sex progressed, Jane expressed desire for John to provide more dominant features to their sex as well as elements of surprise.  To this end Jane wrote a signed note saying:

> "I the undersigned wish to have erotic sex with John and give him permission to do whatever he wishes with me within the bounds of reason."

133.    John understood that whenever he and Jane had sex, he was to include Jane's preferred idiosyncratic and submissive consensual features.

### The March 6, 2014 Incident

134.    On March 6, 2014 and in response to Jane's request to come to his apartment for sex, John explained that he was exhausted after a full and stressful day having traveled to NYC for several doctors' appointments and after more than ten hours that day of public transport including commuter trains, subways and busses, and another five hours in waiting and examination rooms, he still had a midterm exam he had to take in the morning he had not yet studied for. He hoped to make use of the early morning hours to cram for this exam.

135.    John was ambiguous about having her come over and texted that "I'm back in the Have, but have a midterm tomorrow. I guess theoretically you can come tonight, but I literally cannot pay any attention to you. You'd be free to do what you want, though."

136.    Jane pressed him over whether he really wanted her to come or not, and John replied unambiguously that he was not willing or able to have sex: "It would be nice for you to come over, but I have to work. And I mean that. I won't be present. At all."

137.    Yet Jane chose to go to John's suite to engage in sex at about 1:40 a.m.

138.    When Jane entered, John was sitting on his couch, in the outer room of his suite, studying. John's suite contained an outer room with a couch and a small inner room with a bed.

139.    After a few minutes, Jane asked him if there was anything she could do for him, which John and Jane both understood to mean sexually. John declined. He was tired, had to study and was therefore at best ambiguous about Jane's interest to engage in sex.

140.    A few minutes later Jane asked again, and John told her if she wanted she could give him oral sex, but that he had to continue studying, and apologized that he couldn't pay more attention to her. Jane began to give oral sex to John while he studied.

141.    After a few minutes, which included occasional small talk, John indicated to Jane that he had slept with Sally Roe when he and Jane stopped seeing each other after the January Incident.

142.    Indeed, on January 17, 2014, John met Sally at a campus party and had mutually consensual sexual intercourse that night.  That was the only time he and Sally had sexual intercourse. Sally lived in [REDACTED] College where John's closest friends resided, and Sally was a fellow in the Chaplain's Office.

143.    Jane became livid with John. She castigated him for not being monogamous with her, and for putting her in danger of contacting STD's, although as John believed and explained to her, they never agreed to be exclusive; further, he only ever had protected sex with Sally and so had no reason to think he was putting Jane in danger. Jane refused to accept these explanations, and continued to berate him.

144.    John had experienced this kind of excessively emotive reaction several times from Jane in particular during finals in December 2013 and the January 2014 Incident that involved violence when Jane physically assaulted John and prevented him from leaving her apartment, as well as less severe episodes in which she stalked him through texts and phone calls and demanded sexual as well as emotional control over his time and feelings.

145.    As part of her verbal abuse in this argument, Jane "slut-shamed" John for not being monogamous.  John was a virgin when their relationship began, and now he had slept with another woman.  In doing so, Jane appropriated the worst misogynistic tropes to insult and abuse John as Jane wrongfully accused John of being diseased and spreading disease from his sexual activities, which she deemed illicit.

146.    On information and belief had the genders been reversed, and if a hypothetical male actor, Luther, upon a visit to the apartment of the hypothetical female actor, Shirley, she disclosed that she had slept with another man, and Luther launched into an epoch tear in which he "slut shamed" Shirley for sleeping around, demanding control over who Shirley slept with, and accusing her of being diseased and spreading disease from her illicit sexual activities, and refusing to let her study or go to sleep, Yale would have no trouble identifying Luther as the sexist menace, harasser and agitator in that scenario.

147.    Further, having now identified Luther in this gender-reversal scenario as the transgressor, Yale, on information and belief, would have inquired into Shirley's past emotional and/or physical abusive experiences with Luther to determine whether Jane was a victim of IPV and/or stalking.

148.    In reality, it was John [in the role of Shirley] who was on the receiving end of Jane's [in the role of Luther's] demands, anger and abuse, and John feared that Jane would go through hours of circular arguments with him despite John's pleadings that he needed to go to sleep or to study. John also feared that she may physically abuse him as she had done previously.

149.    John begged Jane many times to end the conversation as he was exhausted from the day's events, had an exam in the morning, and could no longer maintain the conversation and wanted to sleep.

150.    Yet, by around 3:30 a.m., Jane was showing no signs of abating her anger or leaving John's apartment.

151.    John decided to prepare for bed whether or not she let him. John told Jane he would continue the conversation the next day, then brushed his teeth despite Jane's protestations that he was now ignoring her. John wished Jane good night and entered the inner room in his suite, his bedroom, and climbed into bed.

152.    Jane followed John on her own will and without force into his bedroom, which Defendant acknowledged to be an *undisputed* fact in the subsequent UWC investigation and hearing that addressed these events.

153.    In his bedroom, Jane continued to complain and argue that John could not leave her like this, that she was upset, and that he was ignoring her.

29

154.   In John's past experience with Jane, her emotional and abusive cycle was bookended with sexual activity, but John was reluctant to have sex with her and was actually adamant that she leave his bedroom and his apartment.  John explained that he could no longer pay her attention, and asked her again to please let him go to sleep to which Jane repeatedly refused.

155.   John at last wished her goodnight and snuggled up against the far corner of his bed against the wall and placed pillows over his head to try to drown out Jane, a fact that Jane did not dispute at the hearing.

156.   Jane continued to harass John by saying he couldn't go to sleep and leave her like this. John did not know what else to do at this point. He had repeatedly asked her to let him go to sleep but she refused, and during the January 2014 Incident, Jane became furious and assaulted John to prevent him from leaving her apartment.

157.   This time, however, John was in his own apartment and feared that if he attempted to leave she may attack him again to prevent him from leaving. Even if he succeeded in leaving his apartment, he would be left outside at four in the morning, with nowhere to go in the cold, wintry night.

158.   On information and belief had the genders been reversed and Luther, a hypothetical male was acting as Jane was acting, Yale would easily identify the hypothetical female actor, Shirley, curled up in the corner of her bed in the fetal position with pillows over her ears begging Luther to leave her bedroom and her apartment so she could sleep, as a victim of sexual abuse and/or IPV.

159.   Finally, John, pinned in his bedroom with his pillows over his ears as Jane refused to leave his bedroom, desperate for sleep and under pressure from an exam scheduled in the

morning which Jane prevented him from studying for,  reluctantly acquiesced to what he reasonably believed was the arc of the emotional/ sexual/abusive cycle Jane was on, and asked her whether she wanted to have sex.

160.    John's dilemma is common of victims of IPV.  As Yale explains through an informational sheet provided by its center for Sexual Harassment and Assault Response & Education (SHARE), "What if I Hit Back?," that "[s]ometimes a survivor of intimate partner violence will react to the abuse by defending him or herself. This does not make this person an abuser  . . . . **Behavior done to protect or defend oneself should be seen as a harm reduction or survival technique, not abuse.** The abuser may say, "See you are as bad as me" . . . . **_but what matters is what is going on over time_** [emphasis added]."

161.    Jane subsequently entered John's bed of her own will and was not was not physically forced into his bed. This too Defendant acknowledged to be an _undisputed_ fact in the subsequent UWC investigation and hearing that addressed these events as Jane expressed at the hearing that, "I could have left, and I just didn't. I don't know why. I could have left, but I wanted him to be nice to me so I got into his bed."

162.    Once in John's bed, she and John engaged in the very sex John asked her to participate in with him that incorporated the submissive elements common to their sexual encounters.  John fell asleep before Jane, and Jane left in the morning.

163.    On or about March 8, John and Jane parted ways after John told Jane they could no longer sleep together in response to her efforts to schedule another sexual encounter.

164.    On or about April 4, 2014 Jane was accompanied to the SHARE Center on the advice and encouragement of friends who worked in the Chaplain's Office where Sally also worked.

31

165.    At that April 4 meeting at SHARE, Jane made allegations against John that became the basis of her complaint to the UWC that Jane filed that same day and were on information and belief known to her friends and in relevant part stated that: "as the argument escalated, he demanded I have sex with him. I was extremely upset by the argument and told him I did not want to have sex with him. He was verbally abusive and threatening at first, but ended up using physical strength to force me to have sex with him while he insulted me and verbally abused me in other ways. Afterwards, he kept both of his arms around me in an aggressive and forceful way, and I felt too terrified to leave the apartment."

**Hostile Environment**

166.    The Chaplain's Office and in particular the Female Chaplains were also aware of Jane's complaint against John, and provided Jane with support and counseling.

167.    On information and belief, in response to Jane' allegations, one of the senior Chaplains suggested that John be castrated as reported by Jane to fellow Yale students.

168.    At a meeting of all of the [REDACTED], the Female Chaplains, aware of Jane's complaint, and in violation of Yale's commitment to impartiality and confidentiality, denounced John and recommended that he be banned from the Center.

169.    As a result of this hostile environment created by the Female Chaplains, [MALE CHAPLAIN 1] advised John to not even return to Yale after the spring 2014 semester as he believed that the hostile environment may be detrimental to John's future at Yale.  On [MALE CHAPLAIN 1's] advice, John stopped attending the Center.

170.    On information and belief, as a result of the breaches in confidentiality surrounding Jane's complaint, and the rise of misandry in the Chaplain's Office, Sally, a fellow in the Chaplain's Office, learned of Jane's accusations.

171.    As of midday on April 5, 2014 Sally and John were communicating as avidly, amicably and affectionately as always and as evidenced by thousands of texts and chats between them.

172.    However, by 6:30 pm on April 5, Sally's mood towards John had drastically changed.  As John was walking with a professor on campus, he saw Sally walking towards them. She looked directly at John, and as if she saw a ghost, Sally did an about-face and hurried away.

173.    John quickly sent her the following message: John Doe Saturday, April 5, 2014 at 6:30pm EDT:  [Sally] are you mad at me or anything of the sort? I saw you on campus and called out to you and you ran the other way. Just wanna make sure we're ok."

174.    Sally did not respond and after that time, Sally ceased all communications and contact with John.

**John is a Survivor of IPV**

175.    Throughout John's relationship with Jane, Jane abused John by trying to control him by calling him repeatedly and demanding his time and attention when he was studying and forcing him to stay in her apartment by physically assaulting him when he attempted to leave during the January 2014 Incident and refusing to leave his apartment on March 6, 2014 despite his many requests that she do so.  She also verbally abused him and berated him and blamed him for her feelings about herself that were beyond his control.

176.    As defined by a SHARE information sheet on IPV, "Common Abusive Behaviors" associated with IPV include "pushing," "controlling where someone goes or does not go," "refusing to leave when asked," "saying the victim caused the abuse."

177.    SHARE's warning signs of IPV explain that  "[a]n abusive person uses intimidation to get their partner to stop or start desired actions" in that the abusive partner may

33

"pout or become angry" or "make life miserable until [her] partner feels like he has to things exactly right or face an angry tirade."

178.    Yale's policy further declares that under the previous stated circumstances, that "[w]hile the abuser gains rights, the victim is losing freedom," and "his . . . world is becoming smaller and smaller" as John experienced while trapped in the corner of his bed with pillows over his head begging Jane to leave.

179.    SHARE's checklist, *Does Your Partner,* describes Jane's behavior towards John in the following ways:  "Treat you roughly—grab, push, pinch, shove or hit you?"; "Blame you for how they feel or act?"; "Make you feel that there is no way out of the relationship?"; "Prevent you from doing things you want to do" like study?; "Try to keep you from leaving after a fight . . . .?"  John can answer "yes" to all of these behaviors.

180.    SHARE's checklist, *Do You,* also describes John's feelings of victimization in his relationship with Jane in the following ways: "Sometimes feel scared of how your partner may act?" and "do what your partner wants you to do instead of what you want?"

181.    When John asked Jane for sex on March 6 it was a defensive act to derail yet another abusive episode. John did not want sex that night. John wanted Jane to leave. John wanted to sleep.

182.    Yet, John, trapped in his bed while Jane maintained her tirade (that also included pouting and alleged crying, which SHARE identifies as an abusive technique to control one's partner), had to defend himself pursuant to SHARE's own advice in the aforementioned, "What if I Hit Back?"

183.    John did not initiate sex, force sex, or even unambiguously and positively want sex with Jane.  John wanted Jane to leave, and requested the only resolution he knew from his

34

experience with her ***over time*** to reduce the harm Jane was causing: consent to sex with Jane. John's actions were not a violation of Defendant's sexual assault or sexual consent rules and standards. John's request and participation in sexual activity were as the SHARE information confirms: a ***survival technique, not abuse***.

### John is Prohibited from Reporting his Experiences of IPV

184.     The UWC complaint filed by Jane accused John of forcible, non-consensual sex, an act that would be considered a felony. Yet, the UWC imposed on John strict restrictions regarding confidentiality, which, among other things, wrongly prohibited John from speaking with an attorney.

185.     Instead, John was assigned as an advisor, [REDACTED], an English professor.

186.     Other than this advisor, Yale had no other resources available to students accused of violating Title IX and did not provide any other resources to John.

187.     On information and belief, [REDACTED] had little training defending students accused of Title IX violations, and among other failures, did not even advise John that he could prepare a written opening statement for his hearing.

188.     On information and belief, Jane had multiple advisors and specialists from SHARE and the UWC and the Chaplain's Office who provided Jane with expertise, advice and support throughout the investigative and hearing process, and consequently was advised that she could write an opening Statement for the UWC hearing.

189.     Upon receiving Jane's complaint, John, a victim of IPV, wished to assert his allegations of emotional and physical abuse against Jane.

190.    John went to the UWC office and spoke with the Aley Menon to report his experience with Jane and in particular the January 2014 incident when Jane physically assaulted him.

191.    The UWC told John that they considered his efforts to counter claim against Jane a violation of the UWC's prohibition against retaliation, for which he would be further disciplined.

192.    The UWC's threat of disciplining John for exercising his right pursuant to UWC guidelines to file a complaint against his abuser for IPV was in itself an act of retaliation.

193.    John asked Ms. Menon, "Is it possible that I am the victim?"

194.    Ms. Menon responded, without an investigation or any evidence, "That is not how we choose to see it."

195.    On information and belief, Defendant has never rejected a complaint of IPV from a female student or dismissed a female student's declaration of and identity as a "victim" of IPV or any other violation of UWC guidelines, but has rejected complaints by males alleging IPV at least four times.

196.    Throughout the UWC's process, Defendant pursuant to the UWC Procedures and by mandate through the OCR promised an impartial procedure.

197.    Throughout the UWC's process, Jane held the status of the complainant or accuser and John held the status of the respondent or the accused.

198.    Each status or capacity should have permitted limited (and temporary) prescribed presumptions specific to each party with regard to the accused's innocence until proven otherwise or the credibility of the accuser's initial complaint.

199.    Such status, however, in an impartial investigation as Yale's UWC Procedures require, do not allow greater weight to the accuser's statements and evidence in comparison to the accused's statements and evidence.

200.    Also, the credibility and motives of each party in an impartial investigation must be weighed by the same standards and criteria.

201.    Further, each party to an impartial investigation and process, regardless of status, must have the same rights with regard to presenting witnesses and evidence and the weight of such witnesses and evidence must be determined by the same standards and criteria.

202.    By wrongly depriving John the right to assert his allegations of IPV against Jane and declaring that the UWC does not see John as a victim, the UWC deprived John of these presumptions and an impartial UWC process.

203.    John also told his advisor, [REDACTED], about his IPV experiences with Jane, and that Jane physically assaulted him during the January incident.

204.    [REDACTED] responded that, Jane, who he never met, was "smaller than you," and "[w]hat were you scared of? The panel's not going to take you seriously."

205.    On information and belief, Defendant never gauged the weight and size of a female complainant against the weight and size of her male abuser to determine whether her abuse was legitimate or gauged a complainant's allegation on whether or not they were serious. Indeed, on information and belief, Yale pursues all complaints filed by female students even if such complaints do not rise to a violation of a UWC policy, as in the aforementioned philosophical inquiry into rape.

206.    On information and belief, Defendant never delegitimized an assault ever alleged by a female student or otherwise discouraged a female student from complaining about IPV.

207.     Further discouraging John's allegations of IPV, [REDACTED] stated that "it takes two to tango," and that the Review Panel "will not take you seriously."

208.     On information and belief (and beyond) not only is it absolutely inconceivable that Defendant would ever advise a female student complaining of sexual assault of any stripe including IPV, that she should drop her claims because "it takes two to tango," but Yale in compliance with the OCR Mandates overtly prohibits even suggesting that a female "victim" or "survivor" of an IPV is somehow a participant in her own abuse and thereby partially responsible for the abusive acts against her.

209.     Instead, [REDACTED] advised John to "be the gentleman in the room and take responsibility" for what happened during the March 6 Incident "or risk being expelled, as Yale is primarily an educational institution, and if the panel perceived that John was "not getting it" they would determine Yale was not a place where John belonged."

210.     On information and belief Defendant never advised a female student to take responsibility for her abuse or to in any way remind her to take responsibility like a lady.

211.     Defendant in no way permitted John to file a formal complaint against Jane for IPV or in any way investigated John's allegations of IPV, although he reported them to the UWC and addressed them in his first responsive statement to Jane's complaint.

## Context: The Singular Moment of Consent vs. The Relationship Over Time

212.     As a result, John was deprived of the protection afforded him through SHARE's policy set forth in "*What if I Hit Back?*" which grants victims of IPV the right to act to defend himself and reduce harm and establishes the policy that such defensive actions of a victim of IPV is to be measured over time within the context of the relationship: "***what matters is what is going on over time.***"

213.     Had John been permitted to assert his claim of IPV *__over time__*  throughout his relationship with Jane and in particular the January 2014 incident, Defendant would have had to assess the totality of the parties' relationship *__over time__*  to access the role IPV played in their relationship and in particular on the night of March 6.

214.     Instead, Defendant wrongfully imposed the no-context standard set forth in the UWC's consent policy that limits the scope and context of the complainant's claims to the singular moment of consent under review and found "that the prior sexual history [not to mention the prior IPV history] between the two parties did not bear on the question of consent in this issue."

215.     In doing so, Defendant acknowledged the argument between the parties only to the extent necessary for Defendant to establish that Jane was upset and crying.

216.     Jane's alleged tears were relevant to Defendant's finding against John that he engaged in non-consensual sex because "a reasonable person would not assume that [Jane] had given 'positive, unambiguous, and voluntary' agreement [to the sexual encounter]: the fact that the argument they had been engaged in for the past hour and a half was still unresolved, *__that she was still visibly upset, shaking, and crying__*.. . . . [emphasis added]."

**The Reasonable Person Standard**

217.     However, by not acknowledging the larger context of Jane and John's relationship and the context of Jane's refusing to let John sleep or leave his apartment, and John's experience of IPV, Defendant overlooked that a reasonable, non-misandristic person would see that John, hovering in his bed in the fetal position with pillows over his ears begging Jane to leave, was also "*'still visibly upset.*'"

218.     Similarly, a reasonable, non-misandristic person, could also find that John's request for sex was not "'positive, unambiguous, and voluntary'" but the only way John knew how to de-escalate Jane's abusive spiral.

219.     Further, to the same degree Jane "'experienced'" John's self-defensive request to have sex with Jane as a "'demand for sex,'" John "'experienced'" Jane's voluntary presence in his bedroom as an act of aggression and abuse given, and in light of the January 2014 Incident, his repeated requests that she let him go to sleep and her continuing presence in his bedroom as an escalating act of aggression.

220.     Defendant wrongfully deprived John the right to assert his allegations of IPV in violation of UWC guidelines and policies and unfairly favored and supported Jane's claims to the detriment of John's claims and experience.

221.     On information and belief, Defendant discriminated against John in violation of Title IX by purposefully narrowing the scope of the context of Jane and John's experience only to the extent that Jane's allegations were contextually relevant and a causal factor in the alleged events.

222.     On information and belief, Defendant arbitrarily and capriciously set the context of the March 6 incident to include facts that supported Jane's claims and excluded facts that were dispositive or otherwise provided John with an affirmative defense.

**Jane's Lack of Credibility**

223.     Defendant further discriminated against John by overlooking Jane's lack of credibility even though she recanted her initial allegation that John physically forced her to have sex with him.

224.    Initially, Jane alleged in her complaint that John "ended up using physical strength to force me to have sex with him while he insulted me and verbally abused me in other ways. Afterwards, he kept both of his arms around me in an aggressive and forceful way, and I felt too terrified to leave the apartment."

225.    During the investigation, The Fact Finder's Report dated May 19, 2014 (the "Investigative Report"), Jane reported that John's demand for sex and physical force became an allegation in which John "took her hand and led her to bed, but he then pulled her on top of him," which led Jane to feeling "terrified *as she lay on top* of him crying *[emphasis added]*."

226.    At the hearing, Jane further weakened her representations and confessed during the hearing that: "He asked me for sex, and I could have left, and I just didn't. I don't know why. I could have left, but I wanted him to be nice to me so I got into his bed."

227.    As stated above, the Panel Report found as an *undisputed* fact that after John requested they have sex Jane entered John's bed without force and on her own volition.

228.    Further, no reasonable person could believe that Jane's allegation that she was "too terrified to leave" John's apartment, which in the Investigative Report became a generalized feeling of being "terrified," or any allegation that Jane was in any way being terrorized by John given John's testimony that he *begged* her to leave repeatedly and that Jane, by her own admission, represented that she was free to leave but rather chose on her own free will to follow John into his bedroom.

229.    Jane was not able to consistently maintain her allegations and changed them during the course of the UWC investigation and proceeding, yet Jane's allegations, regardless of the contradictions and changes, were weighed against John, even when her allegations

41

established that she voluntarily entered John's bed, which was a complete reversal of her initial allegation in the complaint.

230.    Even though Jane's initial allegations were unfounded and untrue, Defendant presumed no ill motives to Jane and found John responsible even though Jane expressly recanted her allegation of being physically forced to have sex with him.

**The Review Panel's Findings**

231.    Unable to find John responsible for physically forcing Jane to have sex, Defendant instead found that the sex Jane voluntarily entered John's bed to have was not "positive, unambiguous and voluntary," pursuant to the UWC's standard for consent.

232.    As stated above, Defendant modified the scope of issues the reasonable person may consider to include Jane's experience of the argument Jane and John were having, but to exclude John's experience of the argument and his past and present experience of IPV.

233.    As a result, the UWC's Review Panel found that "the prior sexual history between the two parties did not bear on the question of consent in this issue" and in doing so also eliminated from consideration that the parties' prior sexual history had over time accrued its own temperament based on mutually agreed to masochistic elements including "dirty talk," which by its nature was intended to make Jane feel submissive and/or humiliated.

234.    By eliminating from consideration what "sex" meant and what it included to these parties, Defendant distorted the reasonable-person's ability to evaluate whether the sex they actually experienced was pro forma for them or included elements that violated the UWC's consent standard.

235.    As such, no reasonable person knowing the type of sex the parties' conventionally experienced would reasonably assume that the parties would choose to _not_ engage in their

idiosyncratic style of sex and conform instead to Yale's default style of sex that does not include John and Jane's usual practices.

236.   Indeed, the sex Jane and John participated in did include the masochistic elements they conventionally and consensually experienced.

237.   Defendant arbitrarily and capriciously excluded from the reasonable person's consideration not only the issue of prior sexual consent but the more complex issue of prior sexual habits that indeed may not establish *whether* the parties want to engage in sex, but *how* the consenting parties will behave once engaged in sex.

238.   By excluding this information, Defendant wrongfully favored Jane and helped her establish her claims, but discriminated against John, and helped Defendant bolster a claim of non-consent against John.

239.   With this bias in mind, Defendant found that the "dirty talk" John used during this encounter, "had the effect of intimidating and coercing [Jane] during sexual intercourse," which is the essence of "dirty talk" and despite no finding that the "dirty talk" they engaged in differed from the parties previous experiences with consensual "dirty talk."

240.   As a later advisor to John, Yale Law Professor Jed Rubenfeld, argued to the UWC, the Report Panel also made the following *undisputed* facts: that Jane and John had had consensual sex on many past occasions.

241.   The Report Panel also found as an *undisputed* fact that Jane asked John if she could come to his room and went there "with the expectation that they would have sex."

242.   The Report Panel also found as an *undisputed* fact that that after arriving at John's room, Jane consensually performed oral sex on him.

43

243.    The Report Panel also found as an *undisputed* fact that that the two then had a heated argument, lasting perhaps an hour and a half, precipitated by John's disclosure that he had slept with another young woman earlier in the semester.

244.    The Report Panel also found as an *undisputed* fact that the complainant was extremely upset at learning that John had not been monogamous.

245.    The Report Panel also found as an *undisputed* fact that John sought to terminate the encounter by going to bed.

246.    The Report Panel also found as an *undisputed* fact that he went to his bedroom (a separate room) and did in fact get into bed.

247.    The Report Panel also found as an *undisputed* fact that the complainant followed him to his bedroom.

248.    The Report Panel also found as an *undisputed* fact that John, from his bed, then expressly "asked her to have sex."

249.    The Report Panel also found as an *undisputed* fact that without force of any kind the complainant voluntarily got into his bed, clothed in a sweater and underwear; and that over the next 20 to 30 minutes, again without any finding of force or threat of force, that the two had sexual intercourse.

250.    Regardless, Defendant arbitrarily and capriciously found John responsible for non-consensual sex with Jane and the Panel recommended that John be suspended for an academic year.

251.    Yale reduced the penalty to "probation," and referenced the then newly published "scenarios," a series of vignettes between couples in the course of a brief paragraph in which

they either achieve consensual sex or not. To justify the penalty, Yale referred to the "Sidney and Harper" scenario as follows:

> Sidney and Harper are dating. On several occasions they are physically intimate, but within limits set by Sidney, who is opposed to having sex at this stage in their relationship. One night, when they are being intimate within their mutually agreed to boundaries, Harper begins to cross them. Sidney expresses concern, but Harper is encouraging, saying "it will be okay just this once." Sidney replies "we shouldn't do this," but continues to touch Harper in an intimate way. As Harper initiates sex, Sidney says, "this is a bad idea" and begins to cry, but embraces Harper and the two proceed to have sex.

252.    In addition to the vignette, the "scenarios" provide a coda that interprets the parties' actions and justifies a penalty.  The coda to the "Sidney and Harper" scenario is as follows:

> Initial consent was followed by ambiguity. Sidney's acquiescence to sex was accompanied by too much dismay to constitute unambiguous agreement, especially given Sidney's longstanding prior refusal to engage in sex.  The UWC penalty would likely fall in the range of probation to suspension.

253.    A reasonable person would not necessarily see any connection between Jane and Sidney.

254.    Sidney seems to be crying because she doesn't want to have sex with Harper.  To the extent Jane was crying at all during the March 6 incident, which John disputed, it was because John was having sex with someone else when Jane believed that she was entitled to John exclusively.

255.    Otherwise, if Sidney's willingness to be physically intimate "but _within limits_ set by Sidney," included no prior opposition to sex and a _carte blanche_ written commitment to have erotic sex with her partner anytime, and a history of seeking out her partner to initiate sexual rendezvous over thirty times in their brief relationship, then, Jane and Sidney are nearly twins.

45

256.     But the most glaring difference between Sidney's experience and Jane's is that the UWC actually took Sidney's past sexual history with Harper and her reticence to sex into account; something Defendant refused to do in this matter.

257.     To have done so would have forced Defendant to find against Jane and in favor of John, an outcome counter to their gender biases.  Jane has no prior history of reticence when it came to sex with John. Instead, Jane's prior history of sex with John included "dirty talk," and an emotional cycle that was abusive to John, the very things Yale wanted to exclude from consideration.

258.     Moreover, Jane was the party who persistently requested and often harassed and emotionally manipulated John for sex, and it was John who often declined or indicated unwillingness to have sex.

259.     Fearing a reasonable person might draw a connection between Jane and John's previous history and the events of March 6, the UWC arbitrarily, capriciously and motivated with bias abandoned its reasoning in the Sidney and Harper coda, and eliminated Jane and John's prior sexual history from consideration.

260.     In doing so, Defendant discriminated against John, who, unlike Harper, did not *initiate* sex. Instead, John initiated the *idea* of sex, and properly asked Jane if she wanted to have sex with him *before* there was any physical contact.

261.     Jane, having willfully come to John's apartment in the first place for sex, and willfully performed a consensual sex act on John, and willfully and forcefully entered his bedroom after refusing to leave upon John's repeated requests, and willfully entered his bed in response to his proper request for sex, clearly consented to John's proper and UWC-compliant request for sex before Jane initiated sex.

262.     Jane's consent was all the more positive, unambiguous and voluntary because by her own representation made to the Fact Finder, Jane not only entered John's bed, but Jane unambiguously initiated physical contact with John as her immediate position once she entered the bed was not a timid "wait and see" location on the other side of the mattress from John, but right *on top* of John.

### Breaches of Confidentiality and Wrongful Disclosures

263.     Jane breached the UWC's aforementioned confidentiality and honesty rules on numerous occasions.  Jane was planning on and did graduate in May 2014.

264.     Both John and Jane had each planned on travelling in [REDACTED]  under different and separate programs, for different and separate purposes and following different and separate itineraries over the summer after Jane's graduation.

265.     The Chaplain's Office sponsored meetings for students travelling to [REDACTED] , and prohibited John from participating.

266.     On information and belief, Jane communicated to Schirmeister and the Female Chaplains that she feared John's presence in [REDACTED] .

267.     Schirmeister threatened John to withhold any funds Yale was providing for him to travel, and demanded that he produce his itinerary.

268.     Later, mutual friends of John and Jane reported that Jane claimed she had evidence that John was going to murder her.

269.     During the trip, Jane reported to David Post, Chair of the UWC that John was stalking her and breaching the confidentiality restrictions.  Dr. Post called John and threatened further disciplinary action.

270.

271.     On information and belief, Schirmeister and the Female Chaplains shared this information with Jane to ensure that his path did not cross the path of Jane, who had already graduated from Yale, while in [REDACTED].

272.     John complained about Jane's confidentiality failures and false claims to one of the Female Chaplains who castigated John for having casual sex, an expression of slut shaming the Chaplains Office would never express to a female student.

273.     Yale also violated FERPA by revealing to Jane and Sally prohibited disclosures regarding John's disciplinary history.

274.     John also reported to Dr. Post Jane's post-hearing claims to a number of his friends that she was forcefully raped. Dr. Post dismissed John's concerns without taking any action.

**Sally and The UWC's Third Strike**

275.     On or about November 6, 2014, John was once again summoned to a meeting in the Title IX Office. John along with [MALE CHAPLAIN 2] met with Angela Gleason, the Yale College Title IX coordinator and Jason Killheffer, Director of Academic Integrity Programs, and Sr. Deputy Title IX Coordinator of Yale University.

276.     At the meeting, Gleason informed John that Sally had made an informal complaint and claimed that John was stalking her as she was seeing him in places all around campus, including places Sally didn't expect to see John, and Sally was seeking a no-contact order.

277.     As was later revealed in the Investigative Report, the places Sally was seeing John was at the Starbucks at the corner of the street on which he lived, and on his only direct route to

48

campus, and [REDACTED] College, where, as John made known to Sally, he met with his closest friends.

278.    Gleason also informed John that Sally was also alleging sexual misconduct, involving "restraint and rubbing."

279.    As Killheffer later confirmed at the hearing in this mater, alleging sexual misconduct is a necessary prerequisite to obtaining a no-contact order.

280.    Gleason explained that Sally was seeking a no-contact order, and the university wanted to work out a "*voluntary* no-contact order" with John pursuant to the UWC's informal complaint process.

281.    To that end, Killheffer asked John to not contact Sally personally, to walk away from Sally if he ever encountered her on campus, to avoid the LGBTQ center, and to not access [REDACTED] College where Sally lived at the time.

282.    John objected to the restriction on access to [REDACTED] College. Residing at Sally's residential college were two of his closest friends who he knew from the Center and were also among his closest academic associates and with whom he had travelled, studied with, routinely offered specialized academic advice, and had instructed in specific areas of thought as well as various languages they were studying at Yale in which John was fluent.

283.    John's association with these students preceded his relationship with Sally, and were among his most meaningful, enduring relationships at Yale, and all the more valuable since his only other social outlet, the Center, had become a hostile environment.

284.    As John lived off campus, he would visit these friends at their residential college nightly for studying, and these gatherings were really the only place on campus where he met

with people outside of the classroom. Without access to their suite there was no other private space on campus for them to gather.

285.    In short, a no-contact order would deny John the right to access, association and education in violation of Title IX.

286.    Such denial was arbitrary and capricious as Sally's allegations of stalking were either not vetted by Defendant or otherwise not evaluated as to whether it met UWC criteria for stalking as the places she was seeing him where she maintained she should not have seen him were the very places John has always been:  the Starbucks at the corner of his block where he had previously invited Sally and indeed studied with Sally, and [REDACTED] College, where John expressly communicated to Sally during their relationship that he had close friends and where he spent much of his free time.

287.    Killheffer and Gleason told John they could work something out that would enable both parties to access the residential college.

288.    Killheffer also informed John that compliance with the voluntary no contact order would not preclude Sally from deciding to bring a formal complaint against him in the future.

289.    When Killheffer followed up to their meeting with an email detailing the terms of the "voluntary no contact order," he breached his oral commitment to allow John to meet with his friends at [REDACTED]  College and concluded as follows:  "We request that you do not enter [REDACTED] College, nor linger near its entry or exit points."

290.    John asked what the repercussions would be if he were not compliant with the [REDACTED] College restriction in the *voluntary* no-contact order.

291.    In retaliation, on November 26, 2014, Killheffer filed a formal complaint against John as follows:  "I write in my capacity as Senior Deputy Title IX Coordinator to file a formal

complaint of sexual misconduct with the University-wide Committee on Sexual Misconduct (UWC) against [John Doe]. A report that I have received alleges that, in March of 2014, Mr. Doe engaged in nonconsensual sexual contact involving restraint with Sally Roe at his off campus residence. In light of [John's] prior violation of Yale's sexual misconduct policy I bring this complaint in accordance with UWC procedures to ensure this matter reaches the UWC."

292.    When served with the UWC complaint by [REDACTED], the new female dean at [REDACTED] College, John declared Sally's claims to be "silly," to which [REDACTED] admonished John for using a sexist word—silly—, which, she explained "is a pejorative term that subjugates women.  Little girls are often told by males that their opinions are silly, which undermines their confidence and marginalizes their experiences. By using the word silly you are perpetuating a culture that is dismissive towards the opinions of women."

293.    But silly it was:  among Sally's allegations to support her claim of stalking and unwanted sexual contact was a bouquet of flowers John brought her and the allegation that John held her hand while watching a play they agreed to attend together.

294.    John was allowed to have an attorney as his advisor during the formal complaint process, but the attorney was not allowed to formally speak on his behalf.

295.    The investigator who prepared the Fact Finding Report, was not impartial as she was a former Yale law student, career Yale employee at the Yale Child Study Center, and had an extensive background working as a therapist for, and advocating for, victims of sexual assault.

296.    The Fact Finding Report concluded that John, as the accused, was motivated to present the facts in the light most favorable to himself, and attributed to Sally purer motives in that bringing a complaint is so painful for the complainant that she never would have done so if it were not true.

51

297.    This sentiment was also asserted by yet another Yale administrator who accused John of doing something wrong by arguing that female students do not file false complaints.

298.    In doing so, the Fact Finder also attributed to John a motive to lie, and did not consider that John may be motivated to tell the whole truth and nothing but the truth in an effort to exonerate himself.

299.    As such, the Fact Finder did not attribute the presumption of innocence to John as it is required to do and instead presumed an aforesaid motive to lie.

300.    During the hearing and when questioned by the panel, Killheffer stated he brought this complaint against John because of a pattern of allegations involving restraint in both complaints.

301.    However, Killheffer's motive to bring a formal complaint based on Jane's previous *allegation* of restraint and force was a slight of hand. Jane's *allegation* was proven to be not credible and was recanted at the hearing when she confessed: "He asked me for sex, and I could have left, and I just didn't. I don't know why. I could have left, but I wanted him to be nice to me so I got into his bed."

302.    Indeed, as was known or should have been known to Killheffer, the Review Panel found as an _undisputed_ fact that Jane entered John's bed without any force and further "was unable to determine by a preponderance of the evidence whether [John] physically restrained [Jane] after sexual intercourse was concluded and prior to his falling asleep" and thereby made *no finding* of force against John.

303.    Killheffer's expressed basis to make a formal complaint on behalf of Sally's allegation of force, even if true, could not establish a prior pattern of John's use of force, and his

action to initiate the formal investigation based on this premise was unfounded, arbitrary and capricious and calculated to harm John.

304.    After making her informal complaint and participating in the fact-finding/investigative part of the UWC process, Sally did not appear at the hearing.

305.    John was found to be not responsible for any of the claims set forth in the UWC complaint, and that the basis for Sally's feelings of dislocation and distress were unfounded and determined that "the frequency and intensity of [John's] presence did not . . . rise to the  level of stalking as contemplated by the Sexual Misconduct Policy."

306.    While UWC policy requires that any party and witness must provide truthful information in all phases of a UWC proceeding during a formal hearing or procedure is subject to penalties and further disciplinary action, John's counter claim of fraud and retaliation against Sally was ignored, not investigated and dismissed.

307.    Interestingly, however, whereas the complainant has no burden of proof pursuant to the UWC, John's counter claims against Sally were dismissed for lack of sufficient proof, even though he proved she had fabricated her central complaint at the very least by a preponderance of the evidence; a rare standard in proceedings that otherwise do not impose burdens of proof on any female accuser.

308.    John also proved some of Sally's supporting allegations conclusively false; yet the panel omitted these instances from their report, and Yale later determined, that he had not sufficient proof that she fabricated any parts of her complaint.

309.    Instead, the UWC expressed their sympathies to Sally for her having "felt dislocated and distressed by her interactions with [John]."

310.     John was placed under a no-contact order with respect to Sally, though he was permitted access to [REDACTED] College except during graduation ceremonies so long as he was in the company of an escort who resided at [REDACTED]  College.

311.     When all was said and done, Sally alleged vague, conclusory and ultimately unfounded claims in an informal complaint to get a no-contact order placed against John, which, through Killheffer's efforts became an unfounded and wrongful and retaliatory formal complaint, which was found in John's favor, and Defendant decided that the most fair way to assert justice for John in such circumstances was to formally institute the no-contact order Sally initially requested even though her claims were unfounded.

312.     No sympathies were extended to John.

313.     As a result of the no contact order, John was banned from attending his best friends' residential college unless accompanied by one his friends who lived there, a restriction not otherwise required of Yale students accessing [REDACTED] College or other residential halls and banned him from attending his friends' graduation ceremony in [REDACTED] College that Sally attended.

314.     Further, by enacting this no-contact order, Yale gave Sally a means with which Defendant could further prosecute John any time she perceived that John stepped out of his restricted path on campus or appeared within her sights.  Such regulatory powers in Sally's hands were particularly punitive and onerous given that Sally's previous allegations that John was within her line of sight when he should not be were proven to be unfounded.

315.     Indeed, Sally did abuse the powers of the no-contact order when after both she and John had graduated in 2015, John traveled to New Haven to meet a friend at a restaurant on campus in which, unbeknownst to John, Jane was working.  Jane asserted her "rights" under the

no-contact order to have John removed from the restaurant by its management. John and his friend were both humiliated and offended, but acquiesced to avoid a disturbance.

316.    Because of this hostile and retaliatory environment created by Defendant, John did not attend his own graduation, also in May 2015 when Sally graduated, as John feared Defendant may bring yet another last-minute discriminatory or adverse action against him.

317.    At her graduation, Yale presented Sally with an award for compassion to others.

318.    Defendant also wrongfully deprived John access to Yale's senior recruiting process held in September 2015 in that he was not informed that the event had been scheduled and when he did attempt to access to the on-line site, he was blocked from applying until after the recruiting period ended. According to the employee John subsequently met at Yale's Career Strategy offices, John was the only Yale student who reported having this issue.

319.    On information and belief, Yale also excluded John from senior events as he was not invited to have photos taken for the yearbook, be notified that there was a yearbook, invited to senior dinner, senior balls, senior dues, and graduation honors.

**ALLEGATIONS REGARDING BREACH OF CONTRACT**

**Yale's Breach of its Policies and Regulations:  The Philosophy Paper**

320.    *Yale College Undergraduate Regulations 2013-2014* (the "Regulations" p.4) requires that each student comply with its regulations and is subject to suspension or termination should the student violate Yale's "commitment to protect free expression."

321.    John complied with these regulations and had a reasonable reliance that his free expression would be supported and enforced by Yale.

322.    Yale breached its "commitment to free expression" when it acted on the TA's complaint about John's philosophy paper.

323. Pursuant to the Regulations, the only proper response to the TA's complaint was to penalize the TA for failing to upholds Yale's "commitment to free expression".

324. Further, Yale imposed wrongful, gender discriminatory, selective enforcement in violation of Title IX by punishing John as a result of the TA's actions and not punishing the female TA at all—indeed supporting her—even though it was she who was participating in a punishable offense.

325. Yale breached "the paramount obligation of the university . . . to protect their right to free expression (Regulations, pp 49-51)."

326. Yale enforces this obligation by "formal sanctions" pursuant to the Yale College Executive Committee for violation of Yale's Free Speech Statement, incorporated herein in its entirety and in relevant part as follows:  "[E]ven when some members of the university community fail to meet their social and ethical responsibilities, the paramount obligation of the university is to protect their right to free expression. ***This obligation can and should be enforced by appropriate formal sanctions.*** If the university's overriding commitment to free expression is to be sustained, secondary social and ethical responsibilities must be left to the informal processes of suasion, example, and argument *[emphasis added]* (Regulations, pp49-51).

327. John had a reasonable reliance that free expression would be supported and enforced by Yale.

328. Yale breached its obligation to enforce its Free Speech Statement and imposed no formal sanction against the female TA and Pamela Schirmeister for each's role in violating the Free Speech Statement and subjecting John to censure and punishment for his actions pursuant to the Free Speech Statement.

### Yale's Breach of its Policies and Regulations:  Jane Doe

329.    The Regulations require that each student comply with its regulations without any carve out for female students or complainants in UWC actions.

330.    The Regulations warrant "temporary or permanent separation from Yale College" should the student violate Yale's prohibition against "physical restriction, coercion, or intimidation of any member of that community," (Regulations, p. 4) and disciplinary action for sexual harassment, harassment, misconduct at a formal hearing, or exerting control over another's person or property (Regulations, p. 6-8).

331.    John performed pursuant to the Regulations when he complained to the UWC office and otherwise made it known of Jane's wrongful acts of physical restriction, coercion, and intimidation, sexual harassment, harassment, misconduct at a formal hearing and exerting control over John's person and property.

332.    Yale breached its duties pursuant to the Regulations when it refused to allow John to file a complaint against Jane or to investigate John's allegations.

333.    Pursuant to the Regulations, acts of violence or physical force, physical restriction, assault, or any other act of violence or use of physical force against any member of the community is subject to disciplinary action pursuant to Yale's Executive Committee (Regulations, p.4) and the UWC if such acts are in the context of sex or an intimate relationship.

334.    John had reasonable reliance that Yale would uphold its Regulations and protect him should he be the victim of physical restriction, coercion, or intimidation.

335.    Yale breached its commitment to address Jane's acts of physical restriction, coercion, or intimidation with temporary or permanent separation.

336.    Further, Yale imposed wrongful, gender discriminatory, selective enforcement in violation of Title IX by punishing John as a result Jane's allegations against John and not even

investigating let alone punishing Jane at all—indeed Yale supported and protected her—even though she had participating in the punishable offenses of physical restriction, coercion, or intimidation.

337.    John alleged or otherwise made it known to the UWC that Jane perpetrated acts of violence or physical force physical restriction, and assault, against him, but Yale's UWC breached its obligation to investigate or discipline Jane.

338.    Further John had a reasonable reliance on the Regulations' prohibition against a student's deliberate and knowing misrepresentation or lying during a formal hearing conducted by university authorities (Regulations, p7).

339.    Indeed, Jane knowingly misrepresented and lied during the formal hearing of her UWC complaint against John as was reported by Jed Rubenfeld, Robert R. Slaughter Professor of Law at Yale Law School, in his appeal letter to Benjamin Polak, Provost dated June 30, 2014 (the "Rubenfeld Letter").

340.     Jane misrepresented during the hearing that she did not like aggressive or rough sex, despite evidence to the contrary.

341.    Jane had admitted in a conversation with another individual that she did like aggressive sex. This individual was interviewed by the fact finder and reported to him that Jane had told her that she "liked aggressive (or "rough") sex."

342.    The fact-finder, in breach of his duty to be impartial and include all relevant facts in his report, failed to include this fact. The fact-finder's charge, under Yale's express provisions, set forth in the UWC Procedures 2013 – 2014 (UWC, 7.3.) is to "describe the relevant facts and circumstances."

343.   Further, John alleged that Jane initiated aggressive sex by requesting that John use dirty talk when having sex, that John be sexually dominant, and to otherwise fulfill her desires, which included fulfilling her rape fantasies and other submissive erotica; which she memorialized with John in writing.

344.   As set forth in the Rubenfeld Letter, "The fact that Jane had acknowledged liking aggressive sex specifically contradicted accusations Jane made against John and was therefore obviously relevant."

345.   Further, as the Rubenfeld Letter sets forth, it was undisputed that John and Jane had engaged in aggressive sex many times in the past.

346.   As the Rubenfeld Letter disclosed, in Jane's accusations against John, Jane sought to portray those acts of aggressive sex as having been imposed on her by John even though she did not want or like them and was "uncomfortable" with them.  The intended effect of these statements was to create an impression of John making Jane acquiesce to aggressive sex acts that she didn't want or like.

347.   As the Rubenfeld Letter argues, Jane did not say to the panel, "I like aggressive sex."  She said essentially the opposite.  The fact that the complainant admitted to liking aggressive sex in a private conversation with a friend directly contradicted her contrary statements to the panel.

348.   Jane also misrepresented facts and lied during the hearing by recanting her allegation in her complaint that John forced her into his bed to have sex.

349.   Indeed the undisputed facts, as Rubenfeld argued to Yale, included: that Jane went to John's room and "*with the expectation that they would have sex;*" that after arriving, Jane *consensually* performed oral sex on John; that John *went to his bedroom (a separate room) and*

*did in fact get into bed*; that the complainant *followed him to his bedroom*; that John, from his

bed, then expressly "*asked her to have sex*"; that there was no ambiguity about this request; that

*without force of any kind the complainant voluntarily got into his bed*, and that over the next 20

to 30 minutes, *again without any finding of force or threat of force,* that the two had sexual

intercourse.

350.    John also had a reasonable reliance on Yale's representation that "Sexual

misconduct is antithetical to the standards and ideals of our community and will not be tolerated;

and that "Yale aims to eradicate sexual misconduct through education, training, clear policies,

and serious consequences for violations of these policies." (Regulations, p. 47)

351.    Yale breached its Regulations by not providing John with any education or

training in connection with Yale's prohibitions against sexual misconduct, and by failing to

eradicate sexual misconduct as practiced by Jane.

352.    John even asked the Dean of Yale College, Yale College's UWC Decision Maker,

to educate him about what course of action he should have taken on the night of March 6, to

which the Dean responded: "…I am unable to offer an answer. I will forward the question along,

however. I cannot promise that a satisfying answer, much less even an answer, will be

forthcoming." Yale never responded further to John's request.

353.    Yale's UWC Procedures 2013 – 2014 (UWC, p.2) has a similar prohibition

against "[s]exual misconduct", which "incorporates a range of behaviors including  . . . . sexual

harassment, intimate partner violence, stalking, and any other conduct of a sexual nature that is

non-consensual, or has the purpose or effect of threatening or intimidating a person or persons"

on which John reasonably relied.

354.    John performed pursuant to the UWC and reported to the UWC his accusations that Jane had committed intimate partner violence, stalking and other behavior that had the effect of threatening, intimidating, and coercing him and had a reasonable reliance that Yale would uphold and enforce its standards, policies and procedures.

355.    Yale breached its duties and obligations and brought no complaint or investigation against Jane in connection with John's allegations.

356.    John also had reasonable reliance on Yale's prohibition of noise and particularly the mandate that students be considerate for the rights of others, particularly between 11 p.m. and 7 a.m. Sunday through Thursday (Undergraduate Regulations, 2013-2014, pp. 88).

357.    It was an undisputed fact during the hearing that between 11 pm and 7 am Jane demanded John's attention even though John had asked her to stop and went to his bed and expressed his wish to go to sleep by resorting to putting a pillow over his ears to drown her out. Jane disregarded John's wishes, was not considerate of his rights, and was in violation of Yale's noise policy.

358.    Yale breached its noise policy by not disciplining Jane for her violations of the noise policy.

359.    John also had a reasonable reliance on the UWC procedures' (UWC, p. 2) promise to provide an "accessible, representative, and trained body to answer informal inquiries and fairly and expeditiously address formal and informal complaints of sexual misconduct."

360.    The UWC breached its obligation to "fairly" address John's complaints of Jane's sexual misconduct and in fact completely abdicated all duties to investigate John's complaint.

361.    John also had a reasonable reliance on the UWC procedures' (UWC, p. 5) that under pain of being subject to a recommendation for a more severe penalty or a referral to an

appropriate disciplinary authority, "[p]arties and witnesses are expected to provide truthful information in all phases of a UWC proceeding. Failure to do so may result in a recommendation.

362.    As detained *supra* Jane misrepresented her interest in submissive sex and lied about John forcing her into his bed for sex and thereby did not "provide truthful information" during the UWC proceeding.

363.    The UWC breached its duty to recommend that Jane be subject to a severe penalty or otherwise be referred to an appropriate disciplinary authority.

364.    John also reasonably relied on the UWC's representation that an "impartial fact-finder from outside the University" will be appointed "to assist in the investigation of the case (UWC, p.16)."

365.    As discussed above, the fact finder, Timothy Pothin, is a former prosecuter, and bills himself on his online work profile as a successful prosecutor and victim's advocate.

366.    Further the UWC Procedures assure that the "fact-finder will describe the relevant facts and circumstances… but will not reach conclusions as to whether those facts and circumstances constitute a violation of University policy. (UWC, p.7)"

367.    Pothin, however, concluded his report by stating that John's statement that he "negotiated" the sex on March 6 "implies something less than a clear expression of consent. At a minimum, it appears Jane may not have have positively and unambiguously given consent...."

368.    Jane breached the UWC's confidentiality restrictions about her accusations against John, the proceeding, and its outcome repeatedly to fellow students and Yale staff without any repercussions despite John's complaints and in violation of the "Provost's Statement on Confidentiality of UWC Proceedings".

369.     The UWC, however, followed up on Jane's allegations that John violated the UWC's confidentiality restrictions, even after she graduated Yale.

370.     At no point did Yale find that Jane's suffering at the hands of John fulfilled any of these requirements.

371.     Yale also did not punish Jane for "unreasonably interfering with [John's]work or academic performance [and] creating an intimidating or hostile academic or work environment in violation of such actions even if off campus  (Regulations, 2013-14, p. 48).

372.     John also had reasonable reliance that Yale would enforce its policy against non-consensual sex as "positive, unambiguous, and voluntary agreement to engage in specific sexual activity throughout a sexual encounter (Regulations, 2013-2014, pp 48) Yet, John, who only requested sex as the only solution to end Jane's harassment, was not afforded the protection of Yale's policy against non-consensual sex as John's actions were not "positive, unambiguous, and voluntary."

### Yale's Breach of its Policies and Regulations:  Sally Roe

373.     *UWC Procedures October 2014* (UWC 2014) require that parties and witnesses to a complaint cooperate in the investigation and provide truthful information in all phases of a UWC proceeding (UWC 2014, p. 4). Failure to provide truthful information or any attempt to impede the UWC process may result in a recommendation for a more severe penalty or a referral for discipline.

374.     Further, *Yale College Undergraduate Regulations 2014-2015* (Regulations 2014-2015)*,* also prohibit deliberate and knowing misrepresentation or lying during a formal hearing conducted by University authorities (Regulations 2014, p. 8).

375.     As detailed *supra* herein, Sally did not provide truthful information in that she fabricated every single one of her allegations including an entire sexual encounter on the night of her alleged assault.

376.     For example, Sally alleged John held her hand at a play after she requested they be platonic, but John showed that the play they attended was four days before Sally's request.

377.     Sally alleged John brought her non-consensual flowers, but John provided texts that showed Sally initiated reaching out to John later that night to say: "Thank you again. :) That was really sweet".

378.     Sally alleged she stopped all contact with John after the alleged assault, but John provided nearly one thousand texts between themselves after the night in question.

379.     Sally asserted she never met John again after the alleged assault, but John provided texts that proved they went for a walk and spent the evening at Starbucks the following night.

380.     Sally alleged John was stalking her because she saw him at Starbucks, where she didn't expect to see him, but John showed that the Starbucks in question was at the corner of his block, on the only direct route to campus from his apartment, that Sally knew this, that Sally and John had been there together several times, and that John had previously invited Sally to study there with him.

381.     Sally alleged she didn't expect to see him at her dormitory, but John provided texts where he told Sally he was there all the time because his closest friends, who Sally knew, lived in that dormitory.

382.    Sally alleged there was only one sexual encounter between them before the night of the alleged assault, and that she found it discomfiting, but John provided texts that showed there were two.

383.    Sally alleged continuous discomfort on being invited into John's apartment that night and at sleeping there because they had ended their sexual relationship, but later admitted to another encounter shortly beforehand, also after they had become platonic,  where she had done the same exact things and that it was "sweet."

384.    Sally alleged she left early in the morning, but the panel found that her keycard indicated she first returned home at about 1 p.m., the time John said she left after a two hour intimate conversation.

385.    Sally alleged John sent her harassing messages on Facebook after she blocked him on that medium, which is an impossibility as those blocked on Facebook cannot send each other messages on Facebook.

386.    Sally alleged John sent her harassing texts after she stopped contact, which John then provided, and the panel determined were not harassing.

387.    The Regulations permit an undergraduate to bring a written complaint of deliberate and knowing misrepresentation or lying during a formal hearing to the attention of the Executive Committee (Regulations 2014, p. 6). The UWC procedures additionally mandate that parties must provide truthful information in all phases of a UWC proceeding (Procedures 2014-2015, 3).

388.    The undergraduate is obliged to bring such a complaint in conjunction with his or her residential college master, residential college dean.  (Regulations 2014 p 6).

389.    John performed pursuant to the Regulations 2014 by having his residential college dean bring a complaint of Sally's knowing misrepresentation or lying during a formal hearing to the Executive Committee.

390.    Yale breached the 2014-2015 Regulations by rejecting John's complaint without investigation.

391.    Jason Killheffer, admitted during the hearing that he proceeded with the formal complaint based on Jane's prior accusation of forcible sex, which she retracted.

392.    Yale further breached its obligation to appoint an impartial fact-finder from outside the University in that Miriam Berkman, the factfinder in the Sally investigation, a graduate of Yale's Law School, worked seven years as an advocate for "children and families" at a Yale Law School clinic, and later to work 21 years at the Yale Child Study center as a social worker for victims of sexual assault and domestic violence, as stated on her webpage bio.

393.    Yale further breached its obligation pursuant to UWC December2014 by penalizing John with a protective order even though there was no finding that he violated University policy ("If a party is found to have violated University policy, the panel will recommend a penalty." UWC, p.8).

**Breaches Regarding Time and Calendar Commitments**

394.    John performed as required pursuant to the timelines, yet Yale breached its deadlines set forth in the UWC Procedures in both the Jane Doe and Sally Roe procedures as follows:

**Jane Doe**

395.    In the Jane Doe process, Yale breached every single UWC Procedures deadline and Yale improvised extended deadline. According to UWC Procedures, (UWC Procedures,

2013-2014, Section 7.8) all timeliness obligations on Yale personnel in a UWC formal hearing are set forth as follows:

396.    The chair must appoint a fact-finder within seven days after receiving the complaint.

397.    The secretary must receive the fact-finder's final report within 21 days after the fact-finder's appointment.

398.    The hearing may begin no sooner than seven days after the secretary's receipt of the fact-finder's final report.

399.    The panel must submit its report within seven days after the final hearing session.

400.    The decision of the provost, dean or associate vice president must be rendered within 14 days after the final hearing session.

401.    The president, provost, or vice president must render a written decision on the appeal within 14 days after receiving it.

402.    In the Jane Doe process the UWC Procedures timeliness requirements were breached as follows:

403.    The chair received the complaint on April 14, 2014, which activated the UWC Procedures timeline from that date. The chair was obligated to appoint a factfinder within 7 days, by April 21. The factfinder was first appointed on April 23, two days late.

404.    The deadline for the factfinder's report was on May 14, twenty-one days after his appointment.

405.    When this deadline passed, Yale sent an email on May 16, two days past the deadline, assuring John the factfinder report was expected to be delivered that day, but certainly no later than May 18.

406.    The factfinder report, however, was not delivered until 7:43 p.m. May 19, just two and a half days before the May 22, 9 a.m. hearing; five days past the UWC Procedures deadline and one day past Yale's improvised deadline.

407.    On May 12, John received an email informing him that the hearing was planned for May 22. John planned his schedule around this date.

408.    This was finalized in an email on May 16, although at that point the hearing was scheduled one day shorter than the obligatory seven day waiting period after delivery of the factfinder report. John was asked if he would waive his right to the full 7 day preparatory period.

409.    John agreed to waive his right to the full 7 day period, accepting the University's assurance that the factfinder's report would probably be delivered to him that day, and certainly by May 18.

410.    When John received the report at last on the evening of May 19, two and a half days before the hearing, he felt too much pressure to cancel, between the university having scheduled at least ten people's itineraries on that date, and having set his own plans based on the May 22 date, and with no alternative date proposed by the University.

411.    The panel report was due on May 29, seven days after the hearing, but was not delivered for another seven days, until June 6, seven days past the deadline.

412.    The Dean's decision was due on June 6, fourteen days after the hearing. Even assuming an interpretation of UWC statute to mean that the dean's decision is due seven days after the panel report, the dean's decision was due June 13.

413.    In the issuance of the panel report, the Dean's decision was set by Yale to June 18, five days after the UWC Procedures deadline.

414.    A two day extension was granted to the parties to respond, but the Dean's decision was kept to May 18 at the time of the granting of the extension.

415.    The Dean's decision was not rendered until June 20, fourteen days after the UWC deadline, seven days late assuming a seven day decision period deadline, and five days late if the extension is included.

416.    The appeal was submitted to the Provost on June 30, after a 5 day extension was granted. The UWC Procedures deadline for the Provost's decision was consequently set to July 14.

417.    A one day extension was granted to the parties to respond to each other's appeal, which would have delayed the deadline for the Provost's decision by one day, to July 15.

418.    On July 15, John received an email stating that the Provost extended his deadline for a decision to July 29, fourteen days late, due to summer schedules.

419.    On August 8, John received an email that the Provost's decision would be rendered by August 13, 29 days after the UWC deadline and fifteen days after the Provost's own deadline.

420.    The appeal decision was finally received on August 14, 30 days after the UWC deadline, sixteen days after the Provost's deadline, and one day after the university's final assurance of an August 13 deadline.

421.    In the Jane Doe procedure, then, Yale missed every one of the UWC Procedures deadlines, as follows. (i) The factfinder was appointed two days late; (ii) the factfinder's report was delivered five days late; (iii) the hearing was set by default four and half days sooner than the Procedures allowed; (iv) the panel report was delivered seven days late; (v) the dean's decision was delivered five to fourteen days late; (vi) the appeal was received 30 days late.

422.     Yale even missed every one of its improvised deadlines as follows: (i) the factfinder's report was delivered 3 days after it was assured and one day after it was guaranteed; (ii) Yale breached its assurance that there would be four to six days between delivery of the factfinder's report and the hearing; (iii) the dean's decision was two days later then the dean's improvised deadline; (iv) the Provost's decision was delivered sixteen days after the Provost's first improvised deadline; (v) the Provost's decision was delivered a day after the University's second improvised deadline.

**Sally Roe**

423.     In the Sally Roe procedure, the relevant UWC Procedures deadlines (UWC Procedures, 2014-2015, October 2 and December 8, Section 7.8) were as follows:

424.     The chair must appoint a fact-finder within seven days after receiving the complaint.

425.     The secretary must receive the fact-finder's final report within 21 days after the fact-finder's appointment.

426.     The panel must submit its report within ten days after the final hearing session.

427.     In the Sally Roe process, the complaint was received on November 26, 2015, activating the UWC Procedures deadline for the appointment of the factfinder to December 3. On information and belief, the factfinder was not appointed until December 9, six days late.

428.     Due to final exams and difficulty in finding and retaining independent counsel, Doe was unable to find an adviser until December 29, a delay of twenty days. The delivery of the factfinder's report should consequently have been scheduled at most twenty-one days later, on January 19. The factfinder's report, however, was not delivered until February 17, 29 days past the generous understanding of the 21 day deadline.

429.    The hearing was on February 27, which set the UWC Procedures deadline for the Panel Report to March 9. The report, however, was not delivered until March 10, one day late.

430.    In the Sally Roe procedure, then, Yale missed the UWC Procedures deadlines three times:  (i) the factfinder was appointed six days late; (ii) the factfinder report was delivered at least 29 days late; (iii) the panel report was delivered one day late.

## JURY TRIAL DEMANDED

431.    Plaintiff hereby demands a trial by jury on all claims so triable.

### FIRST CAUSE OF ACTION
### 20 U.S.C. § 1681 *et seq.*
### TITLE IX OF THE EDUCATION AMENDMENTS OF 1972
### Hostile Education Environment, Sexual Harassment

432.    Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

433.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

434.    Defendant receives federal financial assistance for research and development.

435.    Plaintiff's gender is protected by Title IX.

436.    Plaintiff was repeatedly sexually harassed by Jane, who demanded sexual favors and exhibited physical and emotional abuse within the context of an intimate personal relationship based on Plaintiff's sex.

437.    The ongoing harassment was sufficiently severe and/or pervasive to alter the conditions of Plaintiff's education and created an abusive educational environment for Plaintiff and constituted a continuing violation.

71

438.   Plaintiff reported the sexual harassment to representatives of Yale who had authority to address the discriminatory harassment.

439.   Yale's representatives failed to adequately respond to or address the harassment. Indeed, Yale's representative acted with deliberate indifference with respect to the sexual harassment of Plaintiff.

440.   Yale's conduct as set forth herein was in violation of Title IX's strictures against sexual harassment and Yale is liable to Plaintiff.

441.   Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including emotional distress, and loss of capacity for the enjoyment of life.

442.   By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

## SECOND CAUSE OF ACTION
### 20 U.S.C. § 1681 *et seq.*
### TITLE IX OF THE EDUCATION AMENDMENTS OF 1972
### Hostile Education Environment/Discrimination

443.   Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

444.   Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

445.   Defendant receives federal financial assistance for research and development.

72

446.     Plaintiff's gender is protected by Title IX.

447.     As set forth above, Plaintiff was subjected to discrimination by Yale and denied certain benefits in connection with his educational program, which constituted a continuing violation.

448.     Specifically, Plaintiff was barred from communicating with his teacher in response to his use of the word "rape" in a philosophical, non-sexual context; he was advised to leave Yale upon being accused of sexual assault by Jane; and it was reported a Yale chaplain said that Plaintiff should be castrated.

449.     Further, as set forth above, Plaintiff's complaint that a female student violated Yale's UWC Policies against him were treated with deliberate indifference by Yale representatives.

450.     Plaintiff was discriminated against and denied said benefits as set forth above because he is male.

451.     Yale receives federal education funds.

452.     Yale's discriminatory conduct as set forth herein was in violation of Title IX's strictures against discrimination.

453.     Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including emotional distress, and loss of capacity for the enjoyment of life.

454.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

### THIRD CAUSE OF ACTION
### 20 U.S.C. § 1681 *et seq.*
### TITLE IX OF THE EDUCATION AMENDMENTS OF 1972
### Retaliation

455.    Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

456.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

457.    Defendant receives federal financial assistance for research and development.

458.    Plaintiff's gender is protected by Title IX.

459.    From Fall 2013 through Spring 2015, John having exercised or having attempted to exercise his rights pursuant to Yale's policies on academic freedom, and the UWC's Procedures, experienced repeated adverse actions including punishments, repeated disciplinary actions, isolation from school activities, and being blocked from career services programs.

460.    Through its representatives, Yale was aware of Plaintiff's actions in his philosophy class, and his efforts to file a complaint against Jane for IPV.

461.    As a consequence of such actions, Plaintiff was subjected to adverse school-related actions and was handed punishments that were not commensurate with the available evidence and/or the findings of the investigation.

74

462.     After being accused of violating Yale's UWC Procedures and Policies, Plaintiff was also advised to leave Yale and a Yale Chaplain even stated that Plaintiff should be castrated, he was blocked from participating in career services programs, and from attending graduation ceremonies.

463.     Some or all of these adverse actions by Yale were taken because Plaintiff complained about a violation of his rights under Yale's UWC Procedures.

464.     The adverse actions all occurred within a short time after Plaintiff complained—approximately 18 months.

465.     Yale's adverse actions against Plaintiff were intentional and violated the clear terms of Title IX's strictures against retaliation.

466.     Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including emotional distress, and loss of capacity for the enjoyment of life.

467.     By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

### FOURTH CAUSE OF ACTION
### 20 U.S.C. § 1681 *et seq.*
### TITLE IX OF THE EDUCATION AMENDMENTS OF 1972
### Erroneous Outcome

468.     Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

469.     Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

470.    Defendant receives federal financial assistance for research and development.

471.    Plaintiff's gender is protected by Title IX.

472.     Defendant initiated a prosecution pursuant its UWC Procedures informal complaint procedures against John based on accusation regarding a philosophical inquiry into Plato's *Republic* that on its face did not rise to a violation of UWC Policies.

473.    As a result of Defendant's prosecutions, Plaintiff was put under a no-contact order and was ordered to take sensitivity training.

474.    Defendant initiated a second prosecution initiated by Jane pursuant to UWC Procedures for formal complaints against John based on accusations Jane recanted and otherwise were unfounded.

475.    As a result of Defendant's prosecutions, Plaintiff was put under a no-contact order and probation.

476.    Defendant initiated a third prosecution initiated by Sally pursuant to UWC Procedures for informal complaints against John based on conclusory accusations made by Sally that on their face did not rise to a violation of UWC Policies and otherwise were unfounded.

477.    As a result of Defendant's prosecutions, Plaintiff was put under a no-contact order.

478.    Defendant initiated a prosecution pursuant to UWC Procedures for formal complaints against John based on Killheffer's wrongful allegation that Jane's recanted accusation and Sally's unsubstantiated accusation established a pattern of sexual misconduct.

479.    As a result of Defendant's prosecutions, Plaintiff was found not responsible but was put under a no-contact order anyway.

76

480.     An intentional and motivating factor for Defendant's imposition of these penalties was Plaintiff's gender.

481.     Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including emotional distress, and loss of capacity for the enjoyment of life.

482.     By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

### FIFTH CAUSE OF ACTION
### 20 U.S.C. § 1681 *et seq.*
### TITLE IX OF THE EDUCATION AMENDMENTS OF 1972
### Selective Enforcement

483.     Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

484.     Defendant exhibited patterns of decision-making that tend to show the influence of discrimination against the male Plaintiff that affected the investigation and outcomes of the informal and formal complaints against him.

485.     Defendant exhibited anti-male bias during the disciplinary action by the differential treatment he and the TA in that, among other things, no female student would have been criticized, censored or punished as John was for illustrating a philosophical inquiry into Plato's *Republic* with rape.

486.     Defendant exhibited anti-male bias during the disciplinary action by the differential treatment he and Jane received in that, among other things, the undisputed facts

showed that Jane was the aggressor and refused to leave John's apartment upon repeated requests and that at all times was acting willfully and without force and initiated sex with John even though he wanted Jane to leave and at all times was acting defensively as a victim of IPV.

487.    Defendant exhibited anti-male bias during the disciplinary action by the differential treatment he and Sally received in that, among other things, Sally alleged conclusory, false and unsubstantiated claims but as a result she received a written statement of sympathy from the UWC panel rather than disciplinary action and John was penalized with a continuing no-contact order.

488.    Defendant exhibited anti-male bias during the disciplinary action by the differential treatment he and the TA and Jane and Sally received in that, among other things, Defendant could not attribute a single negative motive to Jane or Sally but determined that by virtue of being accused, John could not be presumed innocent.

489.    Defendant exhibited anti-male bias during the disciplinary action by the differential treatment he and Jane received in that, among other things, Defendant could not attribute a single negative motive to Jane or Sally even though John repeatedly complained of retaliation, breaches of confidentiality and IPV at the hands of Jane.

490.    Defendant exhibited anti-male bias during the disciplinary action by the differential treatment he and Jane and Sally received in that, among other things, Defendant allowed Jane and Sally to introduce claims and evidence based on prior events in their relationship, but John was not permitted to introduce evidence of retaliation, breaches of confidence, fraud or IPV.

491.    Defendant further exhibited anti-male bias during the disciplinary action by the additional differential treatment he and the TA, Jane and Sally received as set forth herein.

492.    Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including emotional distress, and loss of capacity for the enjoyment of life.

493.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

## SIXTH CAUSE OF ACTION
### Breach of Contract

494.    Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

495.    At all times relevant hereto, a contractual relationship existed between Defendant and John pursuant to the UWC Policies and Procedures and Undergraduate Regulations.

496.    Plaintiff and Defendant are required to act in accordance with these UWC Policies and Procedures and Undergraduate Regulations in adjudicating reports of alleged violations of student conduct standards.

497.    Plaintiff was at all times in compliance with and performed pursuant to the UWC Policies and Procedures and Regulations as set forth herein,

498.    For all the reasons set forth above, Defendant materially breached its contracts with John by failing to comply with its obligations, standards, policies, and procedures, and by subjecting him to a blatantly arbitrary and capricious disciplinary proceeding.

79

499.    Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including emotional distress, and loss of capacity for the enjoyment of life.

500.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff John Doe, respectfully requests that the Court:

a. Order Defendant to reverse and expunge its findings of responsibility and sanction from John's education record;

b. Order Defendant to verify this reversal and expungement of John's education record by providing John with certification to third parties that the findings and sanction have been reversed and expunged from John's education record;

c. Pursuant to causes of action first trough sixth, award John damages in an amount to be determined at trial, including, without limitation, emotional damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and all other applicable damages;

d. Award prejudgment interest;

e. Award attorneys' fees and costs pursuant to statutory or common law doctrines providing for such award; and

f. Grant such other and further relief that the Court deems just and proper.

Dated: July 3, 2017

## <u>Certification of Service</u>

I hereby certify that on July 3, 2017 a copy of the forgoing Second Amended Complaint And Jury Demand (redacted version), was filed electronically via the Court's CM/ECF System. Notice of this filing will be sent by e-mail to all appearing counsel by operation of the Court's electronic filing system.

___*/s/ Robert M. Fleischer*___
Robert M. Fleischer (ct11960)

**<u>CERTIFICATION OF SERVICE</u>**

The undersigned hereby certifies that on this 3rd day of July, 2017, a copy of the foregoing **REDACTED Second Amended Complaint and Jury Demand** was filed electronically via the Court's CM/ ECF system and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all appearing parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

The undersigned further certifies that a copy of the UNREDACTED version of this document was served on Defendant's counsel, by e-mail, on this 3rd day of July, 2017, as follows:

> John W. Herrington, Es.
> Jillian R. Orticelli, Esq.
> James M. Sconzo, Esq.
> Carlton Fields Jorden Burt, P.A.
> One State St., Ste. 1800
> Hartford, CT 01610
> Email: jherrington@carltonefields.com
> Email: jorticelli@carltonfields.com
> Email: jsconzo@carltonfields.com

/s/ Robert M. Fleischer
 Robert M. Fleischer (ct11960)