# EXHIBIT L



# Yale Lawsuit Spotlights Title IX, Sexual Assault 'Hysteria'

By Peter Berkowitz
*RCP Contributor*
March 05, 2017

In an October 26, 2016, letter to the Wall Street Journal, Professor David M. Post, chair of Yale's University-Wide Committee on Sexual Misconduct, defended the Ivy League institution's "procedures for addressing sexual misconduct." But his formulation betrayed him. By failing to recognize that sound procedures address *allegations* of misconduct, Post inadvertently raised doubts about the integrity of Yale's procedures. "Yale's process," he nevertheless maintained, "is honest, fair, transparent, and respects privacy."

An amended complaint filed in February in federal court in Connecticut by a recent graduate against Yale, Professor Post, and Senior Title IX Coordinator and Assistant Provost James Killheffer portrays a grimmer reality. If the claims it sets forth are true, Yale's disciplinary procedures sanction abuse of power in the adjudication of charges of sexual misconduct.



In addition to a conventional allegation that the defendants breached Yale's contractual obligations by failing to comply with the university's published policies and procedures, *John Doe v. Yale University, David Post, and Jason Killheffer* includes two unconventional sets of allegations. First, it alleges that though reported his accuser's sexual harassment of *him* to Yale authorities, the university violated its responsibilities under Title IX —a federal statute that prohibits sex discrimination in educational institutions receiving federal funding. It did this by responding with "deliberate indifference"; discriminating against him on the basis of sex; retaliating against him for exercising his rights; and selectively enforcing university rules. Second, Doe contends that while Yale is a private university, not a public institution, its biased treatment of him also violated his 14th Amendment due process and equal protection rights.

The facts of this case present a variation on a by-now-familiar theme. Yet it is almost certainly the only case in which a distinguished member of the law faculty warned administrators, as a disciplinary process examining charges of sexual assault was unfolding, that the administration's conduct placed the school in legal jeopardy. This same professor also subsequently published a scholarly article advancing a novel theory rooted in well-accepted legal principles to explain why, in current circumstances, even a private university's disciplinary procedures must conform to constitutional requirements of fair treatment. Amid what authors KC Johnson and Stuart Taylor have aptly called in the title of their new book, "The Campus Rape Frenzy," *Doe v. Yale et al.* has the potential to reshape the legal landscape.

In the spring of 2014, Yale convened a hearing panel to consider a formal complaint filed against this young man by a female classmate. In accordance with the Obama administration's sweeping reinvention of Title IX in an April 2011 directive, Yale restricted Doe's due process rights. In early June, the panel determined that Doe engaged in sexual intercourse with the complainant without her consent—a statutory definition of rape—and should be suspended for two semesters. That is a serious punishment carrying lifelong consequences but outlandishly lenient for so grave an offense.

After the panel issued its findings, Yale Law School Professor Jed Rubenfeld agreed to serve as Doe's adviser. A leading scholar of constitutional law, privacy, the First Amendment, and criminal law, Rubenfeld wrote a detailed letter on June 11 to then-Dean of Yale College Mary Miller, a professor of art history, before she issued her decision based on the panel's findings. Rubenfeld advised Miller that Yale's handling of Doe's case exposed the university to "potential legal liability as well as detriment to Yale's ongoing efforts both to deal with the very real problem of sexual assault on campus and to respond fairly and effectively to claims of sexual misconduct."

Yale's fact-finder, Yale's hearing panel, as well as both the complainant and Doe agreed to the "core facts," Rubenfeld emphasized. In addition to the absence of a "finding of any intoxication, force, threat, or harassment," all affirmed (emphasis in Rubenfeld's original letter)

- that the complainant and Mr. [Doe] had had consensual sex on many past occasions;
- that on the night in question, the complainant asked Mr. [Doe] if she could come to his room and went there "*with the expectation that they would have sex;*"
- that after arriving at Mr. [Doe's] room, she *consensually* performed oral sex on him;
- that the two then had a heated argument, lasting perhaps an hour and a half, precipitated by Mr. [Doe's] disclosure that he had slept with another young woman earlier in the semester;
- that the complainant was extremely upset at learning that Mr. [Doe] had not been "monogamous";
- that Mr. [Doe] *sought to terminate the encounter by going to bed*;
- that *he went to his bedroom (a separate room) and did in fact get into bed*;
- that the complainant *followed him to his bedroom*;
- that Mr. [Doe], from his bed, then expressly "*asked her to have sex*";
- that *without force of any kind the complainant voluntarily got into his bed*, clothed in a sweater and underwear;
- and that over the next 20 to 30 minutes, *again without any finding of force or threat of*

*force,* that the two had sexual intercourse.

Rubenfeld's letter to Dean Miller left no doubt about his assessment: "it is simply impossible, given the undisputed facts of this case, to conclude that Mr. [Doe] committed sexual assault." Nevertheless, the dean upheld the panel's judgment while reducing the sentence to probation. That still included the career-damaging placement in Doe's permanent file of documents recording the university's conclusion that he perpetrated sexual assault.

Rubenfeld also counseled Dean Miller that had the facts remained the same but the genders been reversed—that is, had a male student acted as did the complainant and a female student acted as did Doe—then the male would surely have been adjudged the aggressor. This, according to Rubenfeld, raised the possibility that in finding Doe guilty of sexual assault, Yale was violating Title IX by discriminating against Doe on the basis of sex.

*John Doe v. Yale et al.* will not be the first lawsuit to advance reverse Title IX claims such as Rubenfeld sketched for Yale's dean in June 2014. But it is very likely the first to test the legal theory that Rubenfeld laid out last fall in "Privatization, State Action, and Title IX: Do Campus Sexual Assault Hearings Violate Due Process?"

The conventional wisdom is that while *public* universities, as government actors, must comply with constitutional requirements, *private* universities operate under no such constraints. This is broadly correct. But under "state action" doctrine properly understood, argues Rubenfeld, "If government requires or induces a private party to engage in law enforcement, all relevant constitutional restraints apply." This, Doe contends, is exactly what the Obama administration Department of Education did in April 2011 when it instructed universities, on pain of losing federal funding, to investigate, adjudicate, and punish all allegations of sexual assault. That is, although the government also demanded that universities shrink due process protections for the accused, by deputizing them to engage in law enforcement in addressing allegations of sexual misconduct, the administration in effect imposed on them an obligation to comply with constitutional guarantees of due process and equal protection.

Beyond the urgent legal questions raised by Doe's lawsuit looms a larger moral and political perplexity also arising, as Rubenfeld recognizes at the conclusion of his article, out of the "many Title IX sexual assault trials taking place all over the country."

"Future historians will wonder how we went through this looking glass," he wrote. "They will ask what combination of activism and appeasement, of real victimization and false victim-mongering, could have led to this new hysteria." The historians "will wonder how so many in positions of respect and authority, who knew or should have known what was happening" at colleges and universities throughout the country, "willingly participated or did not speak."

*Peter Berkowitz is the Tad and Dianne Taube senior fellow at the Hoover Institution, Stanford University. His writings are posted at PeterBerkowitz.com and he can be followed on Twitter @BerkowitzPeter.*





**Leading Doctor Warns "It's Not Too Late To Tighten Saggy Skin— If You Do This"**

Watch The Video

🔥 1,844

Promoted Content

## From the Web

Powered By ZergNet



The Strange Truth of The President's Marriage



Missing Sub That May Have Brought Nazis to South America Found







Nun Makes Surprising Claim About Bible's Mary



Kate Spade's Sister Under Fire for Comments on Designer's Death



Respected Writers Who Were Actually Terrible People



'Sons of Anarchy' Star's Son Sadly Commits Suicide



Exploring the Hidden Waterways of Florida's



Messed Up Things That Really Happened During the

Exploring the Hidden Waterways of Florida's **Paradise Coast**

Messed Up Things That Really Happened During the **Colonial Times**

RealClear

Politics  Policy  Markets  World  Defense  Energy  Health

Science  Religion  Future  Education  Sports  History  Books  Life

About Us   Privacy Policy   Advertise With Us   Contact   RSS   View Mobile Site

Copyright © 2018 RealClearHoldings, LLC.